# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

WALTER BASS III,

        Defendant-Appellant.

FOR PUBLICATION
September 13, 2016
9:15 a.m.

No. 327358
Wayne Circuit Court
LC No. 14-005979-FC

Before: GADOLA, P.J., and WILDER and METER, JJ.

PER CURIAM.

Defendant, Walter Bass III, appeals as of right from his April 15, 2015 jury trial convictions of first-degree, premeditated murder (first-degree murder), MCL 750.316(1)(a), felony murder, MCL 750.316(1)(b), felon in possession of a firearm (felon-in-possession), MCL 750.224f, possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, and disinterment, mutilation, defacement, or carrying away of a human body (mutilation of a human body), MCL 750.160. Defendant was sentenced as a fourth-offense habitual offender, MCL 769.12, to life without the possibility of parole for his murder convictions, 41 to 62 years for the felon-in-possession conviction, 2 years for the felony-firearm conviction, and 41 to 62 years for the mutilation of a human body conviction. We affirm.

## I. FACTUAL BACKGROUND

This case arises out of the March 10, 2013 disappearance of Evelyn Gunter (the victim), whose badly charred remains were eventually discovered in the garage of an abandoned house in Detroit. The evidence against defendant below was almost entirely circumstantial.

At the time of her disappearance, the victim had an intimate, romantic relationship with defendant. The victim introduced her daughter Jemmima Gunter to defendant—who introduced himself as "Tiko"—in December 2012. The victim's teenaged grandson, Dalon Gunter, is the last known family member to have seen the victim alive. Dalon last saw the victim around 5:00 p.m. on March 10, 2013. She arrived at his house alone in her red Impala. The victim dropped off some groceries, spoke with Dalon for roughly five minutes, and then left in her vehicle, again alone. Dalon was unaware of her intended destination.

Early the next morning—March 11, 2013, sometime between midnight and 1:00 a.m.— Jemmima received a text message from the victim's cellphone stating "that she [the victim] was

-1-

going to Chicago to help a friend" and would be back the next night. "Chicago" was misspelled, which was unusual because the victim "was a very intelligent person." Moreover, the victim "had no friends in the Chicago area that [Jemmima] knew of." Suspecting that the victim was being untruthful about her whereabouts, Jemmima responded via text, accusing the victim of lying to conceal substance abuse.[1] In reply, Jemmima received another text from the victim's cellphone. Based on the tone and content, Jemmima suspected the text message had not actually been sent by the victim. After Jemmima sent another message, "someone" responded, "I'm just going to Chicago to help my friend move. I'll be back tomorrow." The message referred to Jemmima by her nickname, "Mya," which was also unusual; the victim "always" called Jemmima by her first name rather than her nickname.

The next day, Jemmima received another text message from the victim's number that appeared to be intended for "someone named Mike," and which contained a request for narcotics, specifically "an eight ball and a 20 bag." Jemmima responded, "[Y]ou sent that message to the wrong person." The response from the victim's phone number indicated that the text had been sent to "Mike" by the victim's "friend," not the victim.

Daniel Hines is the victim's son and was living with her at the time of her disappearance. Hines last saw the victim on March 9, 2013. Thereafter, he noticed that her mail was accumulating, unopened. He later received a call from the victim's employer of 15 years indicating that the victim had not been reporting to work. Daniel was concerned and contacted his sister, Jemmima; it was unusual for the victim to be "missing from the house like that." After the last time Hines saw the victim, he tried calling her several times on her cellphone. At first, "somebody would answer it" but remain silent. Later, around March 12 or March 13 of 2013, Hines called again and heard "a man's voice on the phone[.]" Hines asked, "Who is this?", and the man responded, "Tiko."

On the afternoon of March 12, 2013, the victim's burned body was discovered in the garage of an abandoned house in Detroit. Genetic testing subsequently indicated that the body almost certainly belonged to the victim. The body was "burned pretty much beyond recognition," bound with some kind of wire, and laid out upon a green plastic tarp, which was also burned. In places, the body was burned so severely that bone was visible. A blue "Bic lighter" was found in the driveway in front of the garage.[2] The lighter "stood out because it wasn't weathered at all." A watch and necklace belonging to the victim were found near the body.

---

[1] Although the victim had been "clean" for "over 20 years," Jemmima thought her unusual behavior might have been evidence that she had relapsed into drug use.

[2] Although it was tested, no DNA was recovered in a sample created by swabbing the blue lighter. According to a witness qualified as an expert "in DNA analysis," there are several probable explanations for why no DNA was detected: "nobody touched it [the lighter], there was too little DNA from whomever may have touched it," there was "an inhibiting substance on the sample" (such as dirt or soil), the lighter was deliberately or inadvertently cleaned or wiped, or exposure to the elements destroyed any DNA.

An "expert in fire investigation, cause and origin of a fire" subsequently determined that the fire "[o]riginated at the body." Chemical testing and burn pattern analysis indicated that gasoline was used as an accelerant. In order to "consume bone as with a cremation," as this fire had, it would necessarily have been "extremely hot."

On March 13, 2013, Dr. Lokman Sung, who is an assistant medical examiner and was qualified as "an expert in the field of anatomic and forensic pathology," performed an autopsy on the victim. There were "extensive burns to 100% of the body with consumption of much of the soft tissue, internal organs and fragmentation of most of the bones." A gunshot wound was discovered, with the entry wound situated in "the left top of the head behind the ear," and the exit wound located in "the left forehead region." "[T]hree fragments of a nonjacketed bullet" were "recovered from the skull." Dr. Sung determined that the burns were postmortem and occurred after the victim was shot. There "were seven loops of copper wire wrapped around the body." Dr. Sung was unable to determine whether the wire was wrapped around the victim before death or afterward. Toxicology testing returned positive results for four substances: (1) iron levels consistent with normal bodily function, (2) carbon monoxide, (3) carboxyhemoglobin (a byproduct of carbon monoxide), and (4) caffeine. The victim did not test positive for cocaine, marijuana, or alcohol. Had she used cocaine or marijuana on or after March 10, 2013, those substances would have been detected in the toxicology screening. The cause of death was determined to be the gunshot wound to the victim's head.

Kateesha Bouldin was a patron of Detroit's "Club Celebrity" several times in February and March of 2013 and met defendant there, where he worked as security. After speaking with defendant briefly on the evening that she met him, Bouldin gave him her cellphone number. Thereafter, she began to regularly receive telephone calls and text messages from defendant that originated from his cellphone number. However, at 2:30 a.m. on March 15, 2013—several days after the victim's body was discovered—Bouldin received a telephone call from defendant that originated from the victim's cellphone number.

On March 16, 2013, Jemmima received a telephone call from defendant, who inquired whether Jemmima still[3] wanted him to paint her house. Jemmima declined. During the conversation, defendant never mentioned the victim or her vehicle, nor did he say anything about trying to return the victim's vehicle.

After speaking with her brother, Hines, on March 22, 2013, and learning that the victim "had been no call, no-show to work for all of the days since [Jemmima last] talked to her," Jemmima became very concerned. The victim "never misse[d] work," and on the rare occasions when she did, she did so with good cause after informing her employer that she would be absent. Accordingly, Jemmima went to the police station and reported the victim missing, informing the police that the victim's Impala was equipped with Onstar.

---

[3] The victim had previously asked defendant how much he would charge to paint Jemmima's house, but Jemmima never asked him to do so.

Later that same day, March 22, 2013, the victim's Impala was located outside Club Celebrity. Defendant was working as security at the club that evening. One of the managers knew him by the nickname "Tiko." Earlier that night, Club Celebrity's deejay, Cortlant Smith—who also knew defendant as "Tiko"—had seen defendant arrive at the club alone driving the victim's Impala.

Several witnesses gave varying accounts regarding what took place at Club Celebrity on the evening of March 22, 2013. Along with her partner, Sergeant Shannon Jones of the DPD was dispatched to Club Celebrity after the victim's Impala was located using Onstar. The officers discovered the victim's Impala in the parking lot of Club Celebrity and, after searching it and finding no signs of "foul play," had it towed and impounded. Despite the location and the March weather, the vehicle's sunroof was open, which led Jones to believe that the person who had parked it was likely still nearby. The Impala was parked just two spaces from Club Celebrity's main entrance, where the security personnel—including defendant—were stationed. A leather jacket bearing defendant's DNA was recovered from the Impala's rear floor well.

According to Jemmima, after learning that the victim's Impala had been located, Jemmima, Hines, and other family members went to Club Celebrity and began asking the employees if anyone knew who had been driving the Impala. While Jemmima was at the club, a security guard handed Jemmima a phone; it was a call from defendant's number. Jemmima asked defendant why he had been driving the victim's Impala, and defendant responded that, on her way out of town to Chicago with her friend "Lori," the victim had stopped at defendant's house, given him the keys to the Impala, and "[t]old him to keep her car while she goes to Chicago." When Jemmima asked, "When you called me on the 16th, why didn't you tell me that you had my mom's car?", defendant "really didn't have an answer." Instead, he complained about the Impala, indicating "that he kept calling [the victim] trying to get her to come and get her car back because he couldn't afford to keep putting gas in it and he was tired of hiding it from his girlfriend." After Jemmima sent a text to the victim's number indicating that Jemmima intended to call the police and report the victim as missing, she got a response that read, "I'm okay, just leave me alone."

According to Smith (the deejay), after arriving the police instructed Smith to make an announcement asking whether anyone present was driving an Impala. After Smith made the requested announcement, defendant "disappeared."

According to Avria McKelvey, who is a manager at Club Celebrity and a friend of Jemmima, while the police were trying to gain access to the Impala, defendant approached and asked the police, "What are you doing by my car? What are you doing with my car?" Consistent with McKelvey's description, the victim's cousin Arbie Campell testified that defendant approached the police who were "standing near" the Impala and spoke to them, although Campbell was unable to hear what was said. Contrastingly, however, Sergeant Jones specifically denied that anyone ever approached the officers or claimed ownership of the vehicle.

McKelvey further testified that defendant explained his possession of the Impala to Club Celebrity's staff as "a crack rental," i.e., he claimed that the victim was allowing defendant to "rent" her Impala in exchange for crack cocaine. According to McKelvey, defendant remained at Club Celebrity for an indeterminate period of time after the police arrived, then left abruptly

on foot in the middle of his shift without receiving his nightly cash pay. To McKelvey's knowledge, defendant never returned to Club Celebrity.

Cleophus Clark, Jr., who is a manager at Club Celebrity, testified that he arrived at Club Celebrity on the evening in question while the victim's vehicle was being towed, at which time defendant approached him. Defendant informed Clark that "he gave [the victim] drugs to use her car," and Clark replied, "I have to call the police." As Clark called the police, defendant left the club without collecting his nightly pay. Defendant never returned to Club Celebrity. A "cleanup man" found the victim's credit card in the Club Celebrity parking lot that evening and passed the card along to the club's owner, who in turn passed it to Clark. Eventually, the card was given to the police. Genetic testing performed on the credit card was inconclusive.

According to Campbell, that same evening Campbell initiated a conversation with defendant—who called himself "Tiko"—via cellphone and text message. Campbell asked defendant "if he knew where [the victim] was," and defendant responded as follows:

> He [defendant] told me [Campbell] that he wanted to talk, but he was scared, and he wanted to let us know. He told me that she was okay at first. He was letting me know that she was his aunt. Then he later on was trying to figure out where she was. I told him I was her cousin. He then, after so long, just stopped replying.

During the conversation, defendant indicated that he was "the only person that [the victim] ha[d] been keeping in contact with."

The next month, on the morning of April 10, 2013, defendant provided the following statement to the police "in his own words" regarding "the nature of his last contact with [the victim]":

> Evelyn [the victim] came to my home to bring me some beer. She met me on my street. While outside talking to [her] she asked me to keep her car for her, and after some discussion I agreed. She said that she was going to Chicago with a friend. A few moments later a lady in a Black Ford Fusion pulled up, and Evelyn got out her [sic] car and into the Fusion with the lady whom I heard her being referred to as Lori or Laura.[4] Evelyn then asked me did I know where she could get three eight balls from, and I said[,] 'Yes.' I then went up the street to a guy I know who sells eight balls and et cetera.

> * * *

> I motioned for them to drive up the street when he said that he had it. They gave me the money, and I gave it to him and got the eight balls. We then

---

[4] The officer in charge of the investigation, Sergeant William Hart of the DPD, was never able to identify a person named Laura or Lori associated with the victim.

-5-

went back up the street and Evelyn showed me how to use the Onstar on her car and gave me the proof of insurance and registration. Evelyn then got back in the Fusion and drove off. I haven't seen or spoken to Evelyn since that date.

The victim's cellphone records showed "no movement outside of the state of Michigan," and likewise no movement outside of the "immediate metro Detroit area[.]" Notably, however, the victim's cellphone usage changed dramatically after March 10, 2013. After that date, "there was no longer much evidence of actual outgoing phone calls, and the text messages became very minimal." The victim's credit card statement showed purchases made in the Detroit area after the victim was last seen.[5]

Sergeant Michael McGinnis of the DPD was qualified, without objection, "as an expert in the field of historical cell phone record analysis and tower mapping." From March 14, 2013, through March 23, 2013, there were 15 incidents where the victim's cellphone and defendant's cellphone "were communicating with the same sector, same tower within the city of Detroit." From March 10, 2013, until March 23, 2013, there were no attempted phone calls or text messages between defendant's cellphone and the victim's cellphone. But on March 23, 2013— after the victim's Impala was located—10 separate communications took place between those phones. The last recorded communication between the victim's cellphone and a cellphone tower took place on March 23, 2013, at which time the cellphone was in communication with the tower that services the area where Club Celebrity is situated. After she disappeared, the "home tower" of the victim's cellphone (i.e., the cellphone tower most often used) changed to coincide with the "home tower" of defendant. In McGinnis's opinion, the data strongly indicated that defendant was in possession of, and used, the victim's cellphone after her death.

Defendant elected not to testify at trial and was convicted and sentenced as noted *supra*. The instant appeal ensued.

## II. ANALYSIS

### A. "OTHER ACTS" EVIDENCE UNDER MRE 404(b)

On appeal, defendant first argues that the trial court abused its discretion by holding that "other acts" evidence was admissible under MRE 404(b). The evidence in question regarded defendant's sexual assault of and attempt to murder Carmenience Bullard 17 years before he allegedly committed the charged offenses in this case. Defendant contends that the evidence regarding the sexual assault and attempted murder was inadmissible under MRE 404(b) and that any probative value of such evidence was substantially outweighed by the danger of unfair

---

[5] A March 11, 2013 purchase from "Big Daddy Liquor" using the victim's credit card generated a credit card receipt that was recovered by the police. Jemmima was shown the credit card sales receipt and opined that the signature did not appear to be in her mother's handwriting. But using only the limited handwriting samples provided by the DPD, a forensic document examiner employed by the Michigan State Police was unable to determine whether the signature on the credit card receipt matched the handwriting of either defendant or the victim.

prejudice under MRE 403. We conclude that evidence of the attempted murder was duly admitted, but the trial court abused its discretion by admitting the sexual assault evidence. Nevertheless, reversal is unnecessary because defendant has failed to carry his burden of demonstrating that the erroneous admission of the sexual assault evidence more probably than not resulted in a miscarriage of justice.

"We review for an abuse of discretion a trial court's decision to admit or exclude evidence," while reviewing any preliminary legal questions of admissibility de novo. *People v Mann*, 288 Mich App 114, 117; 792 NW2d 53 (2010). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011). "[A] trial court's decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *People v Cameron*, 291 Mich App 599, 608; 806 NW2d 371 (2011) (quotation marks and citation omitted).

The "other acts" evidence at issue in this case involves the testimony of two prosecution witnesses: (1) Carmenience Bullard, whom defendant sexually assaulted and tried to murder in 1996, and (2) retired detective Robert Henderson, the officer to whom defendant provided a signed admission that he had assaulted Bullard. Bullard testified that, on the evening of October 8, 1996, she was alone at her house in Detroit when defendant stabbed and sexual assaulted her. At the time, Bullard was a 19-year-old college student. She had known defendant since middle school and considered him to be a friend. Defendant came to Bullard's house around 8:30 p.m. and knocked on the door. She let him in and the two watched television, then "messed around a little bit," with defendant performing oral sex on Bullard. Bullard "made him stop," after which they sat together and watched more television. Defendant asked Bullard if she had "any rope or tape or something because it was cold and he needed to do something to the windows." Defendant then left briefly. After calling a friend, Bullard realized that she was uncertain whether she had locked the door after defendant left. As Bullard walked back to the door to ensure that it was locked, defendant let himself back into the house. Bullard "felt nervous"; she had not expected defendant to return. Bullard and defendant walked back to the den. Bullard informed defendant that she had to go pack some clothing because a friend of hers was on the way to pick her up, then she locked herself in her bedroom. Defendant came to the door and "kept asking" if anything was wrong and whether he would have to "get" Bullard out of her room.

Eventually Bullard emerged, thinking that perhaps there was nothing wrong and that it was "just [her] nerves." Defendant was standing in the hallway. As Bullard stepped past him, she felt a "puncture" in her back. She reached back and touched the area. When she pulled her hand away, "it was full of blood." Bullard tried to run, but defendant "grabbed [her] from behind" and "started slicing [her] neck" with a knife. Bullard continued to struggle as defendant stabbed her repeatedly—more than 20 times. She broke loose but defendant grabbed her again and started "slicing" her neck again. Defendant dragged her to the basement. Bullard tried "to play dead," but when defendant poured a liquid of some kind[6] on her—which smelled like

---

[6] Bullard described the unidentified liquid as follows: "like some water or something, liquid[.]" But she also indicated that the liquid smelled like gasoline.

gasoline—Bullard coughed. In response, defendant "socked" her in the jaw and said, "Why won't you die, bitch?" Bullard "just laid there quiet." Defendant mounted her, sexually assaulted her vaginally, and then wrapped her up "in a carpet or something." While wrapped up, Bullard heard defendant slip and fall, after which he unwrapped her and placed her on a couch. At that point, Bullard's mother arrived home and called Bullard's name, and defendant fled. The police were summoned, along with an ambulance. Bullard informed the first responders that defendant was the person who had assaulted her.

Detective Henderson subsequently interviewed defendant, who provided a signed statement. A copy of defendant's statement was admitted into evidence over defendant's continued objection. In the statement, in response to Henderson's question, "What happened last night?", defendant replied,

> I just had a rage. When I came in the house, she was on the phone. I started to look at TV, Tool Time, and after it ended we were just talking. She went into the bedroom, and a short time later she came out. That is when the rage came over me. At first we were just fighting. Then I pulled out a knife I had on me, a kitchen knife. All I remember is stabbing at her. I then took her downstairs to the basement. I was just walking around looking at her and all of the blood.

> \* \* \*

> Until her mother came home, then I ran out the side door.

While speaking with Detective Henderson, defendant denied having sexually assaulted Bullard, insisting, "We had sex, but it was before the fight. I never had sex with her after the fight[.]"

In pertinent part, MRE 404(b) provides:

> (b) Other crimes, wrongs, or acts.

> (1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

Similarly, MCL 768.27 provides:

> In any criminal case where the defendant's motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing the act, in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto;

-8-

notwithstanding that such proof may show or tend to show the commission of another or prior or subsequent crime by the defendant.

"Other acts" evidence is admissible only if,

(1) the evidence is offered for some purpose other than under a character-to-conduct theory, or a propensity theory, (2) the evidence is relevant to a fact of consequence at the trial, and (3) the trial court determines under MRE 403 that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. If requested, the trial court may provide a limiting instruction under MRE 105. [*People v Ackerman*, 257 Mich App 434, 440; 669 NW2d 818 (2003).]

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. When balancing the probative value of evidence of prior bad acts against the danger of unfair prejudice from such evidence, a court must be cognizant that "[p]ropensity evidence is prejudicial by nature[.]" *People v Watkins*, 491 Mich 450, 486; 818 NW2d 296 (2012). However, MRE 403 "does not prohibit prejudicial evidence; only evidence that is unfairly so." *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998). "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *Id.*

In ruling on this issue, the trial court treated Bullard's testimony as if it involved just one prior bad act. Conceptually, however, we conclude that the testimony regarded two distinct prior bad acts: attempted murder and rape. The first of those prior bad acts has logical relevance to the facts of this case; the latter does not.

1. ATTEMPTED MURDER EVIDENCE

Contrary to defendant's argument on appeal, the evidence regarding his attempt to murder Bullard bears logical relevance to a fact of consequence in this case, specifically whether defendant is the person who shot and killed the victim, then tried to dispose of her body using fire. Moreover, given the similarities, the evidence regarding the Bullard incident tends to show defendant's scheme, plan, or system in committing the charged offenses.

Defendant contends that there is little, if any, factual similarity between his assault against Bullard and the facts here. We disagree. Although there are certain differences, there are a number of notable similarities: (1) Bullard was attacked from behind and, similarly, the victim here was shot from behind (in the back of the head), (2) both are women defendant had known for a substantial time, (3) both are women with whom defendant had some sexual[7] relationship at the time of offense, (4) defendant poured a liquid that smelled like gasoline on Bullard and,

---

[7] It is true that Bullard denied that she was defendant's "girlfriend," but she acknowledged that defendant performed oral sex on her before sexually assaulting and attempting to murder her.

similarly, gasoline was used as an accelerant to burn the victim's body, and (5) after stabbing her and slitting her throat, defendant wrapped Bullard "in a carpet or something," and, similarly, the victim's body was found bound with wire atop a plastic tarp. Thus, it seems that evidence of the Bullard incident was both offered for a purpose other than defendant's propensity to commit the charged offenses and relevant to a fact of consequence in this case.

It is a closer question whether the probative value of such evidence was substantially outweighed by the danger of unfair prejudice. Obviously, the testimony regarding defendant's brutal assault against Bullard when she was a teenager was highly prejudicial. As defendant admits in his appellate brief, however, given the circumstantial nature of the proofs against him, his identity as the perpetrator was a "primary" issue at trial. Thus, the similarities between his assault against Bullard and the facts known about the victim's death had a heightened probative value. Given the balancing nature of this inquiry, and the fact that this scenario presents a close call, we do not find the trial court's ruling in this regard to be an abuse of discretion. See *Cameron*, 291 Mich App at 608 ("[A] trial court's decision on a close evidentiary question ordinarily cannot be an abuse of discretion."). The decision to admit the attempted murder evidence fell within the range of reasonable and principled outcomes.

## 2. SEXUAL ASSAULT EVIDENCE

Conversely, we conclude that the trial court abused its discretion by admitting Bullard's testimony that defendant sexually assaulted her. Such testimony has no seeming relevance to a fact of consequence in this case. Defendant was not charged with criminal sexual conduct here, and there is no evidence that the victim in this case was ever sexually assaulted. Given its lack of relevance, the only logical purpose for the introduction of the sexual assault evidence was the improper character purpose, i.e., proof that defendant is a bad person and therefore probably committed the charged offenses.

Most significant, however, is the danger of unfair prejudice under MRE 403. Had defendant been charged with a sexual offense in this case, our analysis would be much different. But here the sexual assault evidence has no seeming probative value, and any marginal probative value that might exist was substantially outweighed by the danger of unfair prejudice. Sex offenders are a loathed class—rightfully so. But knowledge that defendant is a rapist did nothing to help the jurors decide whether he committed the charged offenses here. Instead, without any attendant benefit, the evidence invited jurors to make the impermissible character inference—to decide that if defendant would sexually assault Bullard, a teenage girl he knew well, he is just the sort of "bad" person who might kill his girlfriend and burn her body. Thus, the trial court abused its discretion by admitting evidence that defendant sexually assaulted Bullard.

## 3. REVERSAL IS UNWARRANTED

Even so, reversal is unwarranted. Reversal of a criminal conviction on the basis of a trial court's erroneous evidentiary ruling is only necessary where the error prejudiced the defendant and resulted in a miscarriage of justice. MCL 769.26; *People v Snyder* (*After Remand*), 301 Mich App 99, 111; 835 NW2d 608 (2013). A defendant seeking reversal "has the burden of establishing that, more probably than not, a miscarriage of justice occurred because of the error." *People v Knapp*, 244 Mich App 361, 378; 624 NW2d 227 (2001).

-10-

Although the evidence in this case was largely circumstantial, in ruling on defendant's motion for a directed verdict the trial court aptly reasoned that the circumstantial evidence was "overwhelming" of defendant's guilt. As discussed further *infra*, we agree with that assertion— the circumstantial evidence against defendant *was* overwhelming. Hence, aside from the sexual assault evidence, there was more than ample evidence to convince the jurors of defendant's guilt. Moreover, the trial court gave a limiting instruction regarding Bullard's testimony, which explicitly proscribed the jurors from considering that evidence for improper character purposes. It is presumed that the jurors followed that instruction. See *People v Roscoe*, 303 Mich App 633, 646; 846 NW2d 402 (2014) ("[T]he trial court provided a limiting instruction, which can help to alleviate any danger of unfair prejudice, given that jurors are presumed to follow their instructions."). Thus, despite the erroneous admission of the sexual assault evidence, defendant is unentitled to reversal. He has failed to carry his burden of demonstrating that the erroneous admission of such evidence more probably than not resulted in a miscarriage of justice.

## B. SUFFICIENCY OF THE EVIDENCE

Next, defendant argues that there was insufficient evidence to support his convictions. We disagree.

## 1. IDENTITY

"[I]dentity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). Defendant's primary argument on appeal is that, although the prosecution proved that *someone* committed the charged offenses, it failed to prove beyond a reasonable doubt that defendant was the perpetrator. After plenary review of the record evidence, we conclude that there was sufficient evidence for a rational fact-finder to reasonably infer that defendant was the perpetrator.

Viewing the evidence in the light most favorable to the prosecution, although the identity evidence is circumstantial, and sometimes requires reliance on an inference founded upon an inference,[8] there was sufficient evidence for a rational fact-finder to conclude that defendant was the perpetrator. Defendant was in possession of the victim's Impala after she died, and it is reasonable to infer from the record evidence that he was in possession of her cellphone, as well. Defendant is the last person to report seeing the victim alive and—after she was found dead—he claimed to be "the only person" with whom the victim had been communicating. Cellphone records, however, showed no attempted phone calls or text messages between defendant's cellphone and the victim's cellphone from March 10, 2013, until March 23, 2013. From such evidence, it is reasonable to infer that defendant was lying about his purported communications with the victim and, in turn, it is reasonable to infer that his reason for lying was his desire to suggest that the victim was alive when he knew that she was not. It is further reasonable to infer that defendant used the victim's cellphone to send text messages suggesting that she was alive in

---

[8] See *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002) (rejecting the "flawed" rule that an inference built upon an inference could not be utilized in a sufficiency-of-the-evidence analysis).

order to deter investigation into her death. The fact that the victim's body was badly burned also supports such inferences.

From the evidence (1) that defendant left work early on March 22, 2013, after the police located the victim's car at Club Celebrity, (2) without collecting his nightly cash pay, and (3) that defendant never returned to collect that pay, it is reasonable to infer that defendant had a guilty conscience. People do not generally perform work at a paid job but then fail to collect the pay owed. It is also reasonable to infer that the victim's credit card, which was found in Club Celebrity's parking lot that same evening—March 22, 2013—was deposited there by defendant in an effort to rid himself of incriminating evidence. Additionally, from the numerous similarities between the victim's death and the offenses he perpetrated against Bullard, it is reasonable to infer that defendant was the perpetrator of both assaults.

Moreover, defendant's differing explanations for why he was in possession of the victim's Impala suggest that he was lying to cover up the actual reason (that he took the vehicle after killing the victim). Defendant explained his possession of the Impala to Club Celebrity's staff as "a crack rental," i.e., he claimed that the victim was allowing defendant to "rent" her Impala in exchange for crack cocaine. But he told Jemmima and the police that the victim had entrusted him to keep her Impala while she traveled to Chicago. When Jemmima asked defendant, "When you called me on the 16th, why didn't you tell me that you had my mom's car?", defendant "really didn't have an answer."

Given the circumstantial evidence and the inferences fairly drawn from it, there was sufficient evidence for a rational trier of fact to conclude that defendant was the perpetrator of the charged offenses. Aside from identity, however, defendant also argues that there was insufficient evidence to support each of the essential elements of the offenses for which he was convicted. We will examine each offense in turn.

## 2. FIRST-DEGREE MURDER

"The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v Plummer*, 229 Mich App 293, 300; 581 NW2d 753 (1998) (quotation marks and citation omitted). "Premeditation and deliberation may be inferred from all the facts and circumstances, but the inferences must have support in the record and cannot be arrived at by mere speculation." *Id.* at 301. "Though not exclusive, factors that may be considered to establish premeditation include the following: (1) the previous relationship between the defendant and the victim; (2) the defendant's actions before and after the crime; and (3) the circumstances of the killing itself, including the weapon used and the location of the wounds inflicted." *Id.* at 300.

Defendant argues that the fatal gunshot "could have been accidentally fired," and that, as such, there is insufficient evidence of an *intentional* killing, of premeditation, and of deliberation. There are several facts, however, from which a rational trier of fact could infer that the killing was intentional, premeditated, and deliberate; most notably: (1) the victim was shot in the back of the head, (2) her body was bound with wire and burned using gasoline as an

-12-

accelerant, and (3) she was found in a deserted location. Moreover, the reasonable inferences from the evidence that support defendant's identity as the perpetrator also support an inference that the killing was intentional, premeditated, and deliberate. Thus, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the prosecution, there was sufficient evidence for a rational trier of fact to find defendant guilty of first-degree murder.

### 3. FELONY MURDER

"The elements of felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b)." *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009). The predicate felony relied upon by the prosecution here was larceny, and "larceny of any kind" is a specifically enumerated predicate felony under MCL 750.316(1)(b).

It is undisputed that the victim was killed, and the fact that the victim was killed by a gunshot to the back of her head is sufficient for a rational fact-finder to reasonably infer that the gunshot was inflicted with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result. Thus, the first two elements for felony murder were satisfied. Moreover, given the evidence that defendant was in possession of the victim's Impala and her cellphone following her death, it is reasonable to infer that defendant killed the victim during the commission, or attempted commission, of a larceny of any kind. Hence, there was sufficient evidence for a rational trier of fact to find defendant guilty of felony murder.

### 4. FELON-IN-POSSESSION

Felon-in-possession is a statutory offense that is set forth by MCL 750.224f, which was recently amended by 4 PA 2014. Notwithstanding that amendment, however, the two essential elements of felon-in-possession remain the same as before 4 PA 2014: (1) the defendant is a felon who possessed a firearm (2) before his right to do so was formally restored under MCL 28.424. See MCL 750.224f; *People v Perkins*, 473 Mich 626, 629; 703 NW2d 448 (2005).

Regarding the felon-in-possession conviction, at trial, rather than introducing the judgments of sentence from defendant's prior felony convictions, the parties stipulated that defendant had previously been convicted of a felony that made him ineligible to possess a firearm *on March 12, 2013*. It is unclear from the record why the stipulation focused solely on March 12, 2013, which is the day that the victim's body was discovered but two days *after* she disappeared.

Nevertheless, despite the inexact stipulation, there was sufficient evidence for a rational trier of fact to conclude that defendant possessed a firearm on March 12, 2013—when he was ineligible to do so—and used that firearm to shoot and kill the victim. Specifically, such an inference was reasonable based on the evidence that, although it was in plain sight within the open garage, the victim's body was not found until the afternoon of March 12, 2013. In other

words, a rational juror could reasonably infer that defendant shot the victim on March 12, 2013—not on March 10 or March 11.

## 5. FELONY-FIREARM

Felony-firearm is set forth by MCL 750.227b, which was recently amended by 26 PA 2015. Despite that amendment, we conclude that the elements of the offense remain the same.[9] "The elements of felony-firearm are that the defendant possessed a firearm during the commission of, or the attempt to commit, a felony." *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999).

As we have previously explained, there was sufficient evidence for a rational fact-finder to infer that defendant committed both first-degree murder and felony murder, both of which are felonies. From the evidence that the victim's cause of death was a gunshot to the back of the head, it is reasonable to infer that defendant possessed a firearm during the commission of those felonies. Ergo, there was sufficient evidence for a rational fact-finder to find defendant guilty of felony-firearm.

## 6. MUTILATION OF A HUMAN BODY

No published authority has yet set forth the essential elements of mutilation of a human body under MCL 750.160. We take this opportunity to do so. The statute provides, in pertinent part:

> A person, not being lawfully authorized so to do . . . who shall mutilate, deface, remove, or carry away a portion of the dead body of a person, whether in his charge for burial or otherwise, whenever the mutilation, defacement, removal, or carrying away is not necessary in any proper operation in embalming the body or for the purpose of a postmortem examination, and every person accessory thereto, either before or after the fact, shall be guilty of a felony, punishable by imprisonment for not more than 10 years, or by fine of not more than $5,000.00. This section shall not be construed to prohibit the digging up, disinterment, removal or carrying away for scientific purposes of the remains of prehistoric persons by representatives of established scientific institutions or societies, having the consent in writing of the owner of the land from which the remains may be disinterred, removed or carried away.

---

[9] After careful review of the prior and amended versions of the statute, we have determined that the only substantive change is that an offender can now be guilty either by possessing a "firearm" under subsection (1) or by possessing a "pneumatic gun" *and using it* under subsection (2). In other words, subsection (2) describes a new "pneumatic gun" offense that is distinct from felony-firearm. Because a firearm is at issue in this case—not a pneumatic gun—we do not consider the essential elements of the "pneumatic gun" offense under MCL 750.227b(2).

Based on a plain language analysis involving dictionary definitions, an unpublished opinion of this Court recently interpreted the statute as follows:

> *Black's Law Dictionary* (8th ed) defines "mutilation" as the "act of cutting off or permanently damaging a body part." To "mutilate" is otherwise defined as "to injure or disfigure by removing or irreparably damaging parts." *Random House Webster's College Dictionary* (2001). To "deface" means "to mar the surface or appearance of; disfigure." *Random House Webster's College Dictionary* (2001). To "remove" means "to move or shift from a place or position." *Random House Webster's College Dictionary* (2001). Thus, according to the plain language[2] of the statute, a person may not cause irreparable or permanent damage or injury to, change the appearance of, or remove a portion of, the dead body.
>
> ---
>
> [2] Because the plain language of the statute is clear and unambiguous, we decline to adopt defendant's more restrictive definition of mutilation for which he finds support in this Court's cases related to the common-law tort for mutilation of a dead body. See *Dampier v Wayne Co*, 233 Mich App 714, 729; 592 NW2d 809 (1999) (defining mutilation as the "active incision, evisceration, or dismemberment of a dead body"). We are not persuaded that this tort definition has become a technical, common-law definition, which should affect our analysis of the criminal statute. We note that other defendants have been criminally convicted of this crime where they burned a dead body. *People v Williams*, 265 Mich App 68, 70; 692 NW2d 722 (2005). Burning does not involve cutting, eviscerating, or dismembering a body. [*People v Peña*, unpublished opinion of the Court of Appeals, issued March 13, 2008 (Docket No. 275508); unpub op at 3.]

We find the above analysis highly persuasive. Thus, we hold that a defendant is guilty of mutilation of a human body under MCL 750.160 if the defendant (1) without any legal authorization to do so, (2) causes permanent damage to a portion of a dead body, defaces a portion of a dead body by marring its appearance, or removes or carries away from the whole a portion of a dead body.

Hence, it is clear that there was sufficient evidence for a rational fact-finder to find defendant guilty of mutilation of a human body. As we have explained, it is reasonable to infer from the record evidence that defendant shot and killed the victim. In turn, it is reasonable to infer that defendant is the person who attempted to conceal the murder by burning the victim's body with gasoline. The body was almost totally charred and portions of it were entirely consumed by the fire. The damage was so serious that it could not be visually determined by Dr. Sung whether the body belonged to a male or a female. And it is reasonable to infer from the record evidence that defendant lacked any legal authority to burn the victim's body. Thus, there

-15-

was sufficient evidence that defendant irreparably damaged a portion[10] of the body and defaced it, and his conviction of mutilation of a dead body should be affirmed.

## C. PROSECUTORIAL MISCONDUCT[11]

In his pro se Standard 4 brief, defendant argues that he was denied his right to a fair trial when the prosecution knowingly elicited "false" testimony from three different witnesses and utilized that testimony to secure defendant's convictions. Because defendant did not object below to the testimony in question, this issue is unpreserved, and our review is for plain error affecting defendant's substantial rights. See *Bennett*, 290 Mich App at 475. "To avoid forfeiture, the defendant bears the burden to show that (1) an error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error prejudiced substantial rights, i.e., the error affected the outcome of the lower court proceedings." *Cameron*, 291 Mich App at 618. Here, because defendant has failed to show that the testimony elicited by the prosecution was actually false, he cannot meet his burden of demonstrating that the elicitation of such testimony constituted plain error that affected his substantial rights.

> It is well settled that a conviction obtained through the knowing use of perjured testimony offends a defendant's due process protections guaranteed under the Fourteenth Amendment. If a conviction is obtained through the knowing use of perjured testimony, it must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Stated differently, a conviction will be reversed and a new trial will be ordered, but only if the tainted evidence is material to the defendant's guilt or punishment. Thus, it is the misconduct's effect on the trial, not the blameworthiness of the prosecutor, which is the crucial inquiry for due process purposes. The entire focus of our analysis must be on the fairness of the trial, not on the prosecutor's or the court's culpability. [*People v Aceval*, 282 Mich App 379, 389-390; 764 NW2d 285 (2009) (quotation marks, citations, and brackets omitted).]

Defendant first challenges Hines's testimony that, after Hines last saw the victim, he placed calls to the victim's cellphone that were answered. Defendant incorrectly contends that

---

[10] The word "portion" generally denotes a "limited part of a whole," *Merriam-Webster's Collegiate Dictionary* (11th ed), and we construe it by that plain meaning here. The fire irreparably damaged only a portion of the victim's body, not the whole, as evidenced by witness reports of visible toenail polish on one of the victim's toenails and that intact bone fragments were utilized for DNA testing. Thus, we need not—and do not—consider whether the term "portion" in MCL 750.160 also encompasses damage or defacement of a *whole* human body.

[11] As recently noted in *People v Jackson*, 313 Mich App 409, ___ n 4; ___ NW2d ___ (2015), "although the term 'prosecutorial misconduct' has become a term of art often used to describe any error committed by the prosecution, claims of inadvertent error by the prosecution are better and more fairly presented as claims of 'prosecutorial error,' with only the most extreme cases rising to the level of 'prosecutorial misconduct.' " (Quotation marks and citation omitted.)

the victim's cellphone records "indicate that at no time was there a[n] answered call from [] Hines['s] number . . . or from any other number." Thus, defendant argues, Hines's testimony was false.

Hines testified that after he last saw the victim on March 9, 2013, he tried calling her several times on her cellphone. According to Hines, at first, "every time [he] call[ed] her phone, somebody would answer it, and it be [sic] quiet." Later, "about" March 12 or March 13 of 2013, Hines called again and heard "a man's voice on the phone[.]" Hines asked, "Who is this?", and the man responded, "Tiko." Notably, in his testimony, Hines did not specify that he called the victim exclusively from his own cellphone. Also, he was uncertain regarding the *specific* dates on which he called, and thus he provided an approximate date: "about the 12th or the 13th" of March 2013. Thus, the telephone calls about which Hines testified could have originated from a number other than his cellphone number and might have taken place on days other than March 12 or March 13 of 2013.

Based on the victim's cellphone records, defendant argues that Hines's above testimony was false. The cellphone records, however, do not substantiate defendant's argument. The records demonstrate that Hines tried unsuccessfully to call the victim from his cellphone number at least 16 times between March 11 and March 22, 2013. All such attempts were forwarded to the victim's voicemail. Calls forwarded to voicemail are not, as defendant argues, patently inconsistent with Hines's testimony that he perceived an "answer" by "somebody" with ensuing silence. Additionally, defendant is incorrect that there were no incoming answered calls on the victim's cellphone from "any" number during the germane timeframe. According to the records, there was such a call on March 20, 2013, at 8:44 p.m., lasting one minute. Thus, defendant's claim of error regarding Hines's testimony necessarily fails under plain error review. Defendant has failed to carry his burden of demonstrating that Hines's testimony was actually false and, as such, he has not demonstrated that the prosecution's elicitation of that testimony constituted plain error affecting his substantial rights.

For similar reasons, defendant's claim of error regarding Bouldin's testimony also necessarily fails under plain error review. Based on Bouldin's prior statements that she could not "recall" the specifics of such a call, defendant argues that Bouldin's testimony that she received a call from defendant on March 15, 2013, was actually false.

Defendant's argument is entirely unconvincing. First, Bouldin's trial testimony is not inconsistent with her prior statements. The fact that Bouldin remembered the specifics of the call at trial, whereas she had been unable to in previous statements, is explained by the fact that Bouldin was permitted to review her cellphone records to refresh her memory at trial. Second, even assuming, for the sake of argument, that Bouldin's trial testimony *was* inconsistent with her prior statements, such inconsistencies do not establish that Bouldin's trial testimony was actually false. Although an inconsistent prior statement may be a mechanism to impeach a witnesses' credibility at trial, it is not definitive evidence that the trial testimony is false. Finally, the victim's cellphone records confirm that an outgoing call to Bouldin's number originated from the victim's cellphone on the date in question, March 15, 2013, at 2:30 a.m. Thus, independent evidence supports the veracity of Bouldin's testimony. Since defendant has failed to demonstrate that Bouldin's testimony was actually false, his claim of error in this respect merits no relief.

-17-

Finally, defendant asserts that the prosecution knowingly elicited false testimony from Bullard. Specifically, given the fact that in a prior statement to the police Bullard described the liquid that defendant poured on her as "water," defendant contends that her trial testimony that the liquid smelled like gasoline was necessarily false. Again, however, the existence of a prior inconsistent statement is not evidence that Bullard's trial testimony was actually false. Although defendant's trial counsel used the prior inconsistent statement, on cross examination, to impeach Bouldin's credibility, it does not definitively prove that her trial testimony was false.

## D. EFFECTIVE ASSISTANCE OF COUNSEL

The next argument presented in defendant's Standard 4 brief is that his trial counsel performed ineffectively in three distinct ways. Thus, defendant argues, he is entitled to a new trial. We disagree.[12]

Defendant first argues that, despite the fact that his trial counsel was purportedly aware of false statements in the subscribing officer's statement, counsel failed to investigate the matter or to file a motion to "suppress" defendant's arrest warrant. For dual reasons, defendant's claim of error merits no relief. First, defendant has failed to prove the factual predicate of his claim. He has cited no record evidence that he ever told his trial counsel about the alleged "false statements" supporting the arrest warrant, nor has he cited any record support for his claim that counsel failed to investigate the matter. Second, defendant offers no explanation of how or why counsel's failure to file such a motion to "suppress" the arrest warrant more probably than not affected the outcome of the lower court proceedings. This Court will not supply such argument on his behalf. See *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001), quoting *Mitcham v City of Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959) ("It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow."). And even assuming, arguendo, that the arrest warrant was so deficient as to constitute the metaphorical "poison tree" for purposes of the exclusionary rule, it is not apparent from the record that any evidence used to convict defendant was "fruit" of that poisonous tree. In other words, regardless of any alleged deficiencies in the arrest warrant, it is unclear from the record whether the arrest itself resulted in evidence that the trial court could have suppressed under the exclusionary rule. Hence, defendant's claim of error regarding the arrest warrant necessarily fails.

Defendant's second ineffective assistance argument is that his counsel performed ineffectively by failing to file a motion seeking additional DNA testing of the victim's credit

---

[12] As a threshold consideration, to the extent that defendant now requests that this Court remand this matter for a *Ginther* hearing to permit him to substantiate his claims of ineffective assistance, his request for such relief is improperly made; it appears in the text of his Standard 4 brief, not in a proper motion to remand under MCR 7.211(C)(1). On that basis, we deny defendant's request.

-18-

card, which, defendant contends, could have uncovered exculpatory evidence that someone other than the victim or defendant had been in possession of that card. In support, defendant claims that Andrea Young, one of the prosecution's expert witnesses in DNA analysis, testified that defendant "was excluded as a DNA donor to the credit card and that the major donor to the credit card was from a[n] unknown person[.]"

Defendant misstates Young's testimony. She did not testify that defendant was "excluded" as being one of the several "donors," i.e., people whose DNA was discovered on the credit card. On the contrary, Young testified that the sample drawn from the credit card provided "a partial profile with a mixture of at least two individuals," at least one of whom was male. Defendant was "excluded as being the major donor" in the credit card sample, but it could not be determined whether he was a "minor donor."

In any event, on this record defendant's argument is entirely unpersuasive. Defendant argues that additional DNA testing "could have" yielded exculpatory evidence, but he has produced no record evidence in support of that claim. Without any evidence of what such testing actually would have produced, it is impossible to gauge whether the evidence would have been exculpatory, inculpatory, or inconclusive.

Moreover, defendant's argument fails to recognize that counsel's decision is presumed to have been a matter of trial strategy. See *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94, 100 (2002) ("Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy"). "Defense counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008). Thus, there is a "strong presumption that trial counsel's performance was strategic," and "[w]e will not substitute our judgment for that of counsel on matters of trial strategy[.]" *Id.* at 242-243. Given the fact that Young's testing of the credit card was inconclusive—i.e., she could neither exclude defendant as a DNA donor nor include him as one—defense counsel might have reasonably concluded that a motion for additional DNA testing would have been imprudent. Put differently, counsel might have reasonably feared that additional testing could have revealed inculpatory DNA evidence from which it could be determined that defendant's DNA was on the credit card. Hence, defendant has failed to rebut the strong presumption that his trial counsel's decision in this regard was both strategic and effective.

Finally, defendant argues that his trial counsel performed ineffectively by failing to consult with and retain an expert in cellphone data analysis. Defendant has again failed to prove the factual predicate for his claim. He cites no record evidence indicating whether his trial counsel ever consulted or retained such an expert. The mere fact that such an expert was never called as a witness by the defense does not show that one was never consulted or retained. Additionally, counsel's decision whether to retain an expert witness is a matter of trial strategy. See *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). Defendant has presented no evidence to rebut the strong presumption that his trial counsel's decision whether to retain an expert in cellphone data analysis was both strategic and effective.

## E. MOTION TO QUASH

After he was bound over on the charges against him in district court, defendant filed a motion to quash in the circuit court, arguing that there was insufficient evidence presented at the preliminary examination to satisfy the applicable probable cause standard. The circuit court denied defendant's motion. In the final argument in his Standard 4 brief, defendant argues that that the circuit court abused its discretion by so ruling. We disagree.

"A district court magistrate's decision to bind over a defendant and a trial court's decision on a motion to quash an information are reviewed for an abuse of discretion." *People v Dowdy*, 489 Mich 373, 379; 802 NW2d 239 (2011). However, "[t]o the extent that a lower court's decision on a motion to quash the information is based on an interpretation of the law, appellate review of the interpretation is de novo." *People v Miller*, 288 Mich App 207, 209; 795 NW2d 156 (2010).

"The purpose of a preliminary examination is to determine whether there is probable cause to believe that a crime was committed and whether there is probable cause to believe that the defendant committed it. MCR 6.110." *People v Perkins*, 468 Mich 448, 452; 662 NW2d 727 (2003). "The prosecutor need not establish beyond a reasonable doubt that a crime was committed. He need present only enough evidence" to satisfy the probable cause standard, i.e., sufficient evidence "on each element of the charged offense to lead a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the defendant's guilt." *Id.* (quotation marks, citations, and brackets omitted). "Thus, charges should not be dismissed merely because the prosecutor has failed to convince the reviewing tribunal that it would convict. That question should be reserved for the trier of fact." *Id.*

Although the evidence presented against defendant at the preliminary examination was circumstantial, there was more than enough to satisfy the probable cause standard. Most notably, there was testimony (1) that defendant saw the victim on the evening that she disappeared, (2) that he possessed the victim's cellphone and used it to call Bouldin *after* the victim had been discovered dead, (3) that he possessed and used the victim's car after she died, (4) that he abruptly left Club Celebrity in the middle of his shift after Clark called the police, (5) that the victim's cellphone "went dark" that same night near Club Celebrity, and (6) that the next day the victim's credit card was located in the parking lot of Club Celebrity. Such evidence was more than ample to lead a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of defendant's guilt. Thus, the circuit court did not abuse its discretion by denying defendant's motion to quash.

Affirmed.

/s/ Michael F. Gadola
/s/ Kurtis T. Wilder
/s/ Patrick M. Meter