*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANTHONY WALLACE,

        Defendant-Appellant.

UNPUBLISHED
May 20, 2021

No. 350374
Oakland Circuit Court
LC No. 2019-269556-FH

Before: MARKEY, P.J., and M. J. KELLY and SWARTZLE, JJ.

PER CURIAM.

Defendant, Anthony Wallace, appeals by right his jury-trial convictions of first-degree home invasion, MCL 750.110a(2), four counts of domestic violence, MCL 750.81(2), and larceny from the person, MCL 750.357.[1] For the reasons stated in this opinion, we affirm but remand for the ministerial task of correcting the Presentence Investigation Report (PSIR).

## I. BASIC FACTS

This case arises following a physical altercation between Wallace and his former girlfriend, Daeja Gray. At the time, Gray was living in an apartment with her and Wallace's child. On December 5, 2018, Wallace came to the apartment to drop off their child. Gray and Wallace began a verbal argument that quickly evolved into a fight. Gray testified at trial that during the fight Wallace punched her, pushed her, bit her, and pulled her hair. She recalled screaming at Wallace to leave. At one point, he took the keys to her apartment and left. Gray locked the door. Wallace came back, using the keys to let himself in. The two fought again before Wallace left for a second time. Again, Gray locked the door, and again, Wallace let himself back in. This time Gray was in the bedroom. She testified that Wallace broke her television by kicking it and standing on it, that he broke his son's bed by standing and jumping on it, and that he struck his son in the head

---

[1] The jury acquitted Wallace of unarmed robbery, MCL 750.530, assault with intent to commit sexual penetration, MCL 750.520g(1), assault and battery, MCL 750.81, and an additional count of first-degree home invasion, MCL 750.110a(2).

when he threw the keys. Additionally, Wallace pinned Gray to the floor and straddled her hips. She said that Wallace asked to have sex with her, but she told him no and he did not try to sexually assault her. Instead, he pinched her under her collarbone, bit her leaving a mark, and otherwise attempted to keep her pinned. Gray added that while she was trying to get away, she accidentally wiggled out of her pants and underwear. Eventually, she screamed loud enough that he got off of her and again left the apartment. But before he left, he damaged Gray's phone and grabbed a bag of her personal belongings. Gray locked the door for a third time. She called her mother, who suggested that she call 9-1-1 and report what had occurred.

In her call to 9-1-1, Gray reported that Wallace had broken into her apartment and beat her up. She also stated that Wallace had a gun and had threatened to kill her At trial, she stated that she had lied during the 9-1-1 call because she was emotional and angry because of the "whole situation" and because she was listening to what her mother told her to do.

When the police arrived, Gray was so emotional that the officer could not understand her at first. Eventually, however, she reported that after Wallace broke into her apartment, he physically and sexually assaulted her. A police officer asked her to provide a written statement, and she did so. Parts of the statement were consistent with her trial testimony. However, at trial, she testified that other parts were false, including her claims (1) that Wallace had pushed her face and knocked her to the ground as soon as she opened the door to let her son into the apartment, (2) that Wallace had kicked and stomped her several times during the altercation, (3) that Wallace ran around looking for her keys, (4) that Wallace dragged her though the apartment by her hair, (5) that Wallace said he was going to kill her, (6) that Wallace threatened her with a gun, (7) that she attempted to escape the apartment after he left the first time, (8) that he snatched off her pants and underwear, (9) that when she screamed "no" he squeezed her face with his hands to prevent her from screaming, (10) that they had not had sex since July 2018, (11) that he squeezed her breasts, and (12) that he was not permitted in her apartment during the December 5, 2018 altercation. She testified that she made the false statements because of pressure from her mother and from the officer who asked if she would give a written statement.

Less than a month after the assault, Gray testified at the preliminary examination. At trial, she testified that some of her preliminary examination testimony was false, including her testimony that Wallace did not have permission to be in her apartment and that she locked the doors after each time he left because she did not want him to come back in. She added that, truthfully, she knew he had taken the keys and that she only locked the door when he left because she wanted to make him mad so that they could continue to fight. She testified that the reason she lied at the preliminary examination was because her mother was in the courtroom and she did not want her to be mad. Gray also testified that she was told multiple times by Child Protective Services (CPS) that if she did not testify in court she would lose custody of her child. She noted that she did not want to be in court testifying. Yet, she stated that she was now testifying 100% truthfully about what happened and that she would not lie to get Wallace out of trouble. She added that she had sworn an oath to tell the truth.

## II. PROSECUTORIAL MISCONDUCT

### A. STANDARD OF REVIEW

Wallace argues that he was denied a fair trial as a result of prosecutorial misconduct. Specifically, he argues that the prosecutor knowingly used perjured testimony and that the prosecutor—in cohorts with CPS—intimidated Gray to testifying falsely in order to avoid losing custody of her child. Wallace did not object to the alleged incidents of prosecutorial misconduct or request curative instructions during the prosecutor's closing argument. Consequently, we review this unpreserved issue for plain error affecting his substantial rights. See *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014).

### B. ANALYSIS

Wallace first contends that the prosecutor committed misconduct by introducing perjured testimony. A defendant alleging perjury bears the burden of proving the testimony was actually false. *People v Bass*, 317 Mich App 241, 272-273; 893 NW2d 140 (2016). Here, Wallace asserts that Gray's preliminary examination testimony was perjured testimony. In support, he notes that at trial she testified that key parts of her testimony at the preliminary examination were false. We agree that some of Gray's testimony was necessarily false. For example, at the preliminary examination she testified that Wallace did not have permission to be in her apartment and that she repeatedly locked the door to keep him out, whereas at trial she testified that she wanted Wallace to return to her apartment and that she only locked the door to make him mad. Yet the record shows that Gray disavowed only specific portions of her prior testimony, her written statement, and the 9-1-1 call. She testified that the reason for her early false statements was because she was mad at Wallace, because she did not want to make her mother mad at her, and because she felt pressured by the officer that responded to her 9-1-1 call. But reasons also existed for her to testify falsely at trial. At that time, she was no longer angry at Wallace, and she wanted him to remain involved in their child's life. On this record, there is no one version or part of Gray's story about the incident that is clearly true or clearly false. As a result, although it is apparent that at least some of Gray's testimony was perjured, it is not equally clear that it was her preliminary examination testimony that was false. See *People v Parker*, 230 Mich App 677, 690; 584 NW2d 753 (1998) (the mere fact that a witness's testimony conflict with earlier statements or the testimony of other witnesses does not establish that a prosecutor knowingly presented perjured testimony). Wallace has not met his burden of showing that Gray's preliminary examination testimony was actually false. See *Bass*, 317 Mich App at 272-273.

Additionally, impeachment of a witness's testimony with prior inconsistent statements is a well-accepted part of our legal system. See MRE 801(d)(1)(A); *People v Clark*, 172 Mich App 407, 409; 432 NW2d 726 (1988). Here, the prosecutor asked Gray if she made a statement at the preliminary examination, then asked whether that statement was, in fact, true or false. Then, during closing argument, the prosecutor properly argued that Gray's credibility should be assessed in light of her trial testimony, her preliminary examination testimony, her written statement to the police, and her statements during the 9-1-1 call. Based in part on inconsistencies and consistencies between the various statements, the prosecutor argued that the more credible version of the assault was the one recounted in the 9-1-1 call, the written statement, and the preliminary examination as opposed to her trial testimony that minimized Wallace's culpability. Such a use of a prior

inconsistent statement—even a prior inconsistent statement given under oath—was permissible. Therefore, the prosecutor did not commit misconduct by questioning Gray about inconsistencies between her trial testimony and her preliminary examination testimony. Indeed, the prosecution's use of prior inconsistent statements gave the jury information about Gray's various statements and motivations, and it allowed it to decide how much credence to give her trial testimony. See *People v Minor*, 213 Mich App 682, 685; 541 NW2d 576 (1995) (observing that a "witness' motivation for testifying is always of undeniable relevance and a defendant is entitled to have the jury consider any fact that may have influenced the witness' testimony").

Wallace also argues that the government coerced Gray to offer testimony that Gray insisted was untruthful and that, in the process, Wallace was denied his right to a fair trial. There is no evidence on the record[2] to support that the prosecution or CPS coerced Gray to testify untruthfully. Instead, the prosecution asked Gray about what happened and allowed her to testify however she wanted and merely impeached her with her inconsistent statements. And, although Gray stated that she was told by CPS that she had to testify or she would lose her child, she did not state that she was directed to testify consistently with her prior statements. Instead, Gray testified that a CPS worker told her "you've got to go to court, you have to testify or that they were going to take my son from me if I didn't." Later, on cross examination, she testified as follows:

> *Q.* Okay. Now, you testified that the CPS worker told you that if you didn't go to court that you could lose your child, is that correct?
>
> *A.* Yes.
>
> *Q.* Did they tell you this once, more than once?

---

[2] Over a year after Wallace was convicted, Gray signed an affidavit averring that before the preliminary examination she told the prosecutor that she had made untruthful and inaccurate statements about the altercation when speaking to the police. She stated that "[d]espite my admissions . . . I was advised that I was required to testify consistently with the statements that I had made to police previously," and that if "I did not offer such testimony," she might lose custody to her child. She averred that in the absence of such threats "her preliminary examination and trial testimony would have been different." She does not indicate how her testimony would have differed. The parties may not expand the record on appeal. *People v Nix*, 301 Mich App 195, 203; 836 NW2d 224 (2013). Consequently, we do not consider her affidavit. And, even if we did consider it, we would find it has little value. "As a rule, the court is not impressed by the recanting affidavits of witnesses who attempt to show that they perjured themselves at trial." *People v Norfleet*, 317 Mich App 649, 661; 897 NW2d 195 (2016) (quotation marks and citation omitted). Here, notwithstanding her proclamations that her testimony would have been different but for the prosecutor's threats, the record shows that she attributed her lies at the preliminary examination to her mother's presence in the courtroom. Further, as reflected by the prosecutor's lengthy impeachment using Gray's prior statements, Gray did not testify consistently with her prior statements. Thus, her ability to testify as she saw fit at trial was not compromised by the prosecutor's alleged threats.

-4-

*A*. No, she told me that more than once, multiple times.

*Q*. And did you believe her?

*A*. Yes, I was scared.

A CPS caseworker testified that no such threat was made. But even if Gray's testimony on that point were unimpeached, Gray did not testify she had to testify consistently with her prior statements. Thus, to the extent that there was a threat, the jury was aware of it and was in a position to evaluate Gray's credibility in light of that threat.

Relatedly, Wallace argues that his defense lawyer provided constitutionally deficient assistance by failing to object to the prosecutor's use of perjured testimony and to the witness intimidation being conduct by the prosecutor and CPS. However, as indicated above, the prosecutor's actions were not improper. Consequently, his claim of ineffective assistance is without merit. See *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018) (stating that a defense lawyer is not ineffective for failing to raise a futile or meritless objection).

## III. PSIR

Wallace next argues that the PSIR should be corrected to remove references to his sexually assaulting Gray. Although Wallace was acquitted of sexual assault, he did not challenge the references to it that were included in the description of the offense section of the PSIR. Subsequently, he realized that such information might affect his parole eligibility notwithstanding that he was acquitted of the conduct described. We recognize that "[c]ritical decisions are made by the Department of Corrections regarding a defendant's status based on the information contained in the presentence investigation report." *People v Uphaus*, 278 Mich App 174, 182; 748 NW2d 899 (2008). Thus, although the information was not disputed and was not considered in sentencing, we nevertheless remand for the ministerial task of correcting the PSIR so that it does not reflect a sexual assault that the jury determined he did not commit.

Affirmed, but remanded only for the ministerial task of correcting Wallace's PSIR. We do not retain jurisdiction.

/s/ Jane E. Markey
/s/ Michael J. Kelly
/s/ Brock A. Swartzle