*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DARRELL WILDER, also known as DARRELL JOHN WILDER, also known as DARRELL J. WILDER,

Defendant-Appellant.

UNPUBLISHED
August 13, 2019

No. 327491
Wayne Circuit Court
LC No. 14-004600-FH

ON SECOND REMAND

Before: BORRELLO, P.J., and MARKEY and RIORDAN, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of felon in possession of a firearm (felon-in-possession), MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), third offense, MCL 750.227b.[1] This case is before us again after being remanded from our Supreme Court for the second time. We have been instructed to reconsider our harmless-error analysis with respect to erroneously admitted testimony of one of the witnesses at trial. For the reasons set forth in this opinion, we again affirm defendant's convictions.

## I. BACKGROUND

We have previously given detailed accounts of the pertinent underlying facts of this case in our prior opinions. *People v Wilder*, unpublished per curiam opinion of the Court of Appeals, issued September 27, 2016 (Docket No. 327491) (*Wilder I*), pp 1-2, rev'd in part and remanded

---

[1] Defendant was acquitted of carrying a concealed weapon, MCL 750.227.

-1-

502 Mich 57 (2018); *People v Wilder (On Remand)*, unpublished per curiam opinion of the Court of Appeals, issued November 27, 2018 (Docket No. 327491) (*Wilder III)*, pp 2-3, vacated in part and remanded 928 NW2d 213 (Mich, 2019). To summarize, defendant was arrested and prosecuted after Detroit Police Officers Steven Fultz and David Shaw discovered a handgun in the trunk of a car by which defendant and a group of other people had been standing. Both officers testified at trial that they saw defendant put a handgun from his pocket into the trunk of the car, although two individuals who were with defendant near the car that day also testified at trial that they did not see defendant walk to the trunk of the car that day and had never before seen the gun that was recovered. The parties stipulated at trial that defendant had a prior conviction for a specified felony and was ineligible to possess or use a firearm.

Currently at issue is the effect on defendant's trial of erroneously admitted testimony by defendant's wife, Tameachi Wilder. In reversing *Wilder I*, our Supreme Court in *People v Wilder*, 502 Mich 57, 60-61; 917 NW2d 276 (2018) (*Wilder II*), summarized the pertinent part of Tameachi's testimony as follows:

> On direct examination, the witness testified that she did not see defendant with a gun when he left the house on the date in question, that to her knowledge he did not own a gun, and that she did not have any weapons in the house. She was not asked about and did not offer any other information about defendant's history with guns.

> On cross-examination, the prosecutor did not question the witness about defendant's possession and ownership of weapons on the day of the crime but instead asked three times whether the witness knew of defendant to carry guns. The witness responded "no" to each question.[1] Over defendant's objection, the trial court—which mischaracterized both the evidence on direct examination and the witness (referring to her as a character witness rather than a fact witness)— then permitted the prosecutor to question the witness about defendant's prior weapons convictions.[2]

_____

[1] The precise exchange was as follows:

> *Q*. Do you know of Mr. Wilder to carry weapons?

> *A*. No.

> *Q*. Do you know of him to carry guns?

> *A*. No.

> *Q*. You've been with him for nine years and you don't know of him to carry guns?

> *A*. No.

[2] The precise exchange concerning the first prior conviction was as follows:

Q. And you know that he was convicted of carrying a weapon back then [in 2007], correct?

A. Yes.

Q. So you knew that he carried weapons, right?

A. No. I didn't know but he was convicted.

Q. Okay. You didn't know that he—you didn't see a weapon in your house?

A. No.

Q. Do you know the circumstances behind that?

A. No.

The prosecutor then asked about the second prior conviction, as follows:

Q. And you know that he was convicted of having a weapon back in August of 2010 too, right?

A. Yes.

Q. Was that gun in your home?

A. No.

---

After the jury convicted defendant of felon-in-possession and felony-firearm, defendant appealed as of right to this Court where we affirmed his convictions. *Wilder I*, unpub op at 1. As pertinent to the issue currently before us on remand from the Supreme Court, we concluded in *Wilder I* that Tameachi's testimony in response to the prosecutor's cross-examination questioning regarding her knowledge of defendant's prior firearms convictions was admissible under MRE 404(b), rejecting defendant's argument to the contrary. *Id*. at 2-4. Our Supreme Court subsequently reversed that part this Court's "judgment holding that the cross-examination of defense witness Tameachi Wilder concerning whether she knew of defendant to carry guns and her knowledge of the defendant's prior weapons convictions was not error." *Wilder II*, 502 Mich at 69-70. The Supreme Court concluded that this evidence was inadmissible under MRE 404 and remanded the case to this Court "to consider whether the error was harmless." *Id*. at 63, 70.

On remand, we concluded that this evidentiary error was harmless, analyzing the issue as follows in Part III of our opinion:

Defendant was convicted of felon-in-possession and felony-firearm. The crime of felon-in-possession is defined in MCL 750.224f, which makes it a felony for an individual who has been convicted of a felony to, among other things, possess or carry a firearm unless certain requirements not at issue in the instant case are met. See also *People v Bass*, 317 Mich App 241, 267-268; 893 NW2d 140 (2016). "To be guilty of felony-firearm, one must *carry* or *possess* the firearm, and must do so *when* committing or attempting to commit a felony." *People v Burgenmeyer*, 461 Mich 431, 438; 606 NW2d 645 (2000); see also MCL 750.227b(1). "Possession of a firearm can be actual or constructive, joint or exclusive. [A] person has constructive possession if there is proximity to the article together with indicia of control." *People v Johnson*, 293 Mich App 79, 83; 808 NW2d 815 (2011) (quotation marks and citations omitted). Felon-in-possession may serve as the underlying felony to support a conviction for felony-firearm. *People v Calloway*, 469 Mich 448, 452; 671 NW2d 733 (2003).

In this case, defendant's convictions were strongly supported by the untainted and unequivocal testimony of two police officers who observed defendant in possession of the firearm. Both Fultz and Shaw testified that they observed an individual, later identified as defendant, pull a handgun from his pocket and place it in the trunk of a car as Fultz and Shaw approached the car. Neither officer saw anyone else walk near the trunk of the car. The officers approached and placed handcuffs on defendant. Fultz opened the trunk, and Shaw recovered a handgun from inside. The gun was the only item in the trunk. Additionally, the parties stipulated at trial that defendant had a prior felony conviction and was not eligible to possess a firearm at the time of his arrest; consequently, the pertinent element at issue for purposes of both the felon-in-possession and felony-firearm charges was whether defendant carried or possessed the firearm. Because the trial evidence set forth above established that defendant possessed a firearm when he was ineligible to do so based on his prior felony conviction, defendant's convictions for felon-in-possession and felony-firearm were adequately supported by the strong, untainted evidence.

Examining the erroneously admitted testimony regarding Tameachi's knowledge of defendant's prior convictions, it is worth emphasizing that the jury was independently apprised that defendant had previously been convicted of a felony and was ineligible to possess a firearm at the time of his arrest. The references to defendant's prior convictions during Tameachi's cross-examination were relatively brief, and the convictions were from several years before the incident that led to the instant case. The prosecutor argued during closing argument that Tameachi's admission that she knew about defendant's prior convictions showed that she lied. However, Tameachi's credibility was essentially inconsequential in this case because the evidence for which defendant sought to rely on her was extremely weak for his defense. Even if the jury were to believe Tameachi's testimony that she did not see defendant with a gun when he left the house that day, especially considering that Tameachi was not present in the vacant lot where Fultz and Shaw observed defendant with a gun, Tameachi's testimony did little to undercut the police officers' testimony that they saw

-4-

defendant with the gun on his person and saw him place it in the trunk of the car, after which they immediately confronted defendant and located the gun. In other words, even accepting Tameachi's's [sic] testimony as true, it is not at all contradictory to the testimony of the police officers because defendant could have had the gun hidden from Tameachi's view or obtained it at some point after leaving her sight. We also note that there was testimony at trial that defendant failed to appear for the originally scheduled date of his trial. He was arrested approximately four months later, after which the instant trial commenced. Evidence of flight is probative because it may indicate consciousness of guilt. See *People v Unger*, 278 Mich App 210, 226; 749 NW2d 272 (2008).

> Therefore, in light of the overwhelming untainted evidence demonstrating that defendant is guilty of these crimes involving straightforward and uncomplicated facts, we conclude that defendant has failed to meet his burden on appeal of showing that it is more probable than not that the erroneous admission of Tameachi's cross-examination testimony regarding her knowledge of defendant's prior felony-firearm convictions was outcome determinative. [*People v Lyles*, 501 Mich 107, 117-118; 905 NW2d 199 (2017); *People v Denson*, 500 Mich 385, 413 n 15; 902 NW2d 306 (2017)]. Because the error was harmless, there is no error requiring reversal and we affirm defendant's convictions. [*Wilder III*, unpub op at 7-8.]

Subsequently, on June 12, 2019, our Supreme Court entered an order vacating Part III of this Court's opinion in *Wilder III* and remanding the matter to this Court "for reconsideration of the defendant's argument." *People v Wilder*, 928 NW2d 213 (Mich, 2019) (*Wilder IV*). The Supreme Court explained:

> The Court of Appeals erred in asserting that the erroneously admitted testimony of Tameachi Wilder regarding her knowledge of the defendant's prior firearms-related convictions was harmless due to the "untainted and unequivocal testimony" of two police officers that they saw the defendant in possession of the gun. The Court of Appeals failed to acknowledge that two other witnesses (Charmell Richardson and Carlos Wilder) offered testimony that contradicted that testimony. That failure resulted in the Court of Appeals effectively determining that the officers' testimony was credible and that Richardson's and Wilder's was not. On remand, the Court of Appeals shall engage in "an examination of the entire cause," *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999), and reconsider whether it is more probable than not that the error was outcome determinative. [*Id*.]

We granted the parties the opportunity to file supplemental briefs as part of our consideration of this matter currently before us on remand.[2]

## II. ANALYSIS

We now reconsider our harmless-error analysis as instructed by our Supreme Court. "Preserved, nonconstitutional errors are subject to harmless-error review, governed by MCL 769.26[.]" *Lyles*, 501 Mich at 117. MCL 769.26 provides:

> No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice.

"[W]hether admission of other-acts evidence is harmless is a case-specific inquiry; the effect of an error should be determined by the particularities of an individual case." *Denson*, 500 Mich at 413 n 15. When considering whether an error was harmless, the question is whether there would have been a "*difference in the outcome*" had the error not occurred. *Lyles*, 501 Mich at 118.

In *Lukity*, 460 Mich at 495, our Supreme Court held that MCL 769.26 "places the burden on the defendant to demonstrate that 'after an examination of the entire cause, it shall affirmatively appear that the error asserted has resulted in a miscarriage of justice.' " The *Lukity* Court further explained:

> [R]eversal is only required if such an error is prejudicial and . . . the appropriate inquiry "focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence." The object of this inquiry is to determine if it affirmatively appears that the error asserted "undermine[s] the reliability of the verdict." In other words, the effect of the error is evaluated by assessing it in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error. Therefore, the bottom line is that § 26 presumes that a preserved, nonconstitutional error is not a ground for reversal unless "after an examination of the entire cause, it shall affirmatively appear" that it is more probable than not that the error was outcome determinative. [*Id*. at 495-496 (citations omitted; second alteration in original).]

In this case, Fultz testified that he and his partner, Shaw, were traveling in their police vehicle at approximately 4:20 p.m. on May 16, 2014, when he saw five or six men and one woman next to a silver Chevrolet Monte Carlo that was parked in a vacant lot. At this point,

---

[2] *People v Wilder*, unpublished order of the Court of Appeals, entered July 23, 2019 (Docket No. 327491).

Fultz was approximately 100 feet away from the group of individuals. These individuals "were kind of scattered towards the front of the vehicle around the hood area." Fultz further testified that as he and Shaw approached the car, he saw defendant with "a large bulge on his right side" that "was like a cylinder" and that was protruding from defendant's right pocket. Fultz recognized the cylinder as "a drum that attaches to a handgun." Fultz explained that a "drum" is something that "holds a large capacity of ammunition for a handgun." According to Fultz, he and Shaw continued to approach the group, and defendant looked at them and "began to walk along the side of the driver side of the silver Monte Carlo." Fultz indicated that defendant "retrieve[d] something from a female's hand and he continued walking to the rear of the vehicle." Fultz stated that it was a key but that "at the time I didn't know it was a key." Fultz testified that defendant continued walking to the rear of the Monte Carlo, opened the trunk, "pulled a handgun up from his right pants pocket," placed the gun in the trunk, and closed the trunk. Fultz stated that the drum was "connected to the handgun." Then defendant returned to the front of the car on the driver side and handed the key back to the woman. Fultz did not see anybody else walk to the trunk of the Monte Carlo.

Fultz and Shaw detained defendant, and they asked the woman for the keys to open the trunk. Fultz testified that defendant replied and indicated that the trunk would not open because the car battery was dead. The woman eventually gave Fultz the key. He opened the trunk and found "the handgun with a large drum attached to it laying in the middle of the trunk." Fultz testified that the gun was the only thing in the trunk. After Fultz determined that defendant did not have a valid concealed pistol license (CPL), defendant was arrested. Fultz maintained at trial that he had no doubt that defendant was the person he saw place the gun in the trunk. Additionally, Fultz testified that the gun recovered from the trunk was a Glock, that he was never issued a Glock by the Detroit Police Department, that the Detroit Police Department did not issue a "drum" to him, and that he did not have the drum with him that day before he found it in the trunk of the Monte Carlo.

Shaw testified, similarly to Fultz, that he and Fultz were driving in their police vehicle when he saw a large group of people standing in a vacant field near a silver Monte Carlo. Shaw testified that as he and Fultz were approaching, he saw defendant look at the police car, turn around, and walk to the rear of the Monte Carlo. Shaw saw a "black large cylinder object hanging out of [defendant's] front right pocket." Shaw admitted that he did not initially recognize what the cylinder was when he first saw it hanging out of defendant's pocket. But he "knew it wasn't something that wasn't [sic] supposed to be there which caught [his] attention." Shaw continued to watch defendant as he and Fultz approached in their car. According to Shaw, defendant opened the trunk, "pulled a [G]lock pistol with a 50 round drum attached to the pistol" out of his pocket, and placed the gun in the trunk. Shaw testified that he recovered the gun from the trunk after Fultz received the key and opened the trunk. Shaw also indicated that there was nothing else in the trunk.

Charmell Richardson, who was defendant's cousin, testified that she owned the Monte Carlo and that it was parked in the vacant field that day. She was trying to sell the car, and her cousin Carlos Wilder was attempting to jump-start the car. According to Richardson, more than six other people were there that day, but she was the only woman. Both she and defendant were outside the car, on the driver side. Richardson testified that she never saw defendant walk to the rear of the Monte Carlo and that she did not ever give defendant the car keys. When the police

officers asked her about opening the trunk of the car, she told them that the battery was dead and that she could not open the trunk. Richardson explained at trial that the trunk could be opened with the key but that it did not work all of the time so she "always used the button to pop [the] trunk." She gave the car keys to one of the police officers after the car was "boosted." Richardson also testified that she had never before seen the gun or the drum that were recovered from the trunk of her car.

Carlos, who is also defendant's brother, testified that he and defendant had gone to the vacant field that day because Carlos was interested in buying the Monte Carlo from Richardson. When the police arrived, Carlos and defendant were working on fixing some damage to the Monte Carlo's front end, and they were preparing to "give the car [battery] a boost because it was dead." Carlos testified that Richardson was sitting in the car with the door open, "waiting on us to boost the car up so she could start it," but she got out of the car when the police arrived. Carlos further testified that he never saw defendant walk to the back of the car and that he never saw the trunk of the car open until the police officer opened it. According to Carlos, when the officer opened the trunk of the Monte Carlo, "[h]e threw a couple items on the ground and he said he found a gun." It appears that Carlos indicated in his trial testimony that he had never before seen the gun or the drum that were recovered from the Monte Carlo's trunk and that he had not seen defendant in possession of that gun, although his testimony on these points was somewhat vague and unclear.

As previously discussed, Tameachi testified that she did not see defendant with a gun when he left their apartment with Carlos that day and that defendant did not own a gun. This testimony was in addition to the erroneously permitted testimony from Tameachi regarding defendant's two prior weapons-related convictions.

We begin our harmless-error analysis by identifying the nature of the error at issue so that its effect may be assessed "in light of the weight and strength of the untainted evidence." *Lukity*, 460 Mich at 495 (quotation marks and citation omitted). Here, the prosecution elicited testimony from Tameachi that she knew about defendant's two prior weapons-related convictions, and the trial court erroneously permitted this testimony in violation of MRE 404.

Next, in assessing the effect of this error, the "object of this inquiry is to determine if it *affirmatively appears* that the error asserted undermine[s] the reliability of the verdict." *Lukity*, 460 Mich at 495 (quotation marks and citation omitted; alteration in original; emphasis added). Furthermore, for the error to be a ground for reversal, it must be "more probable than not" that the outcome of the trial would have been different had the error not occurred. *Id*. at 495-496.

In conducting this assessment, we are cognizant of "the deeply rooted and unwavering principle that other-acts evidence is inadmissible for propensity purposes." *Denson*, 500 Mich at 397 (stating that this principle is reflected in the first sentence of MRE 404(b)(1)).[3] We also

---

[3] MRE 404(b)(1) provides as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may,

acknowledge that this "rule reflects the fear that a jury will convict a defendant on the basis of his or her allegedly bad character rather than because he or she is guilty beyond a reasonable doubt of the crimes charged" and that "the very danger of other-acts evidence is . . . that using bad acts evidence can weigh too much with the jury and . . . so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Denson*, 500 Mich at 397-398 (quotation marks and citation omitted; second ellipsis in original). Admittedly, in the words of our Supreme Court, "[t]he risk is severe that the jury will use the evidence precisely for the purpose that it may not be considered, that is, as suggesting that the defendant is a bad person, a convicted criminal, and that if he did it before he probably did it again." *Id*. at 410 (quotation marks and citation omitted).

In this case, we recognize, as we did in our prior opinion, that the jury was independently informed pursuant to the parties' stipulation that defendant had previously been convicted of a felony and was not eligible to possess or use a firearm. In other words, although the stipulation did not identify the nature of the prior conviction while Tameachi's testimony made it apparent that defendant had prior convictions related to weapons in this case involving weapons-related charges, it still bears emphasizing that it was not news to the jury that defendant had been convicted of a crime before.[4] Additionally, the references to defendant's prior convictions during Tameachi's cross-examination were brief and lacking in any underlying details of the offenses other than identifying them as being related to carrying a "weapon." The prior convictions were also from several years before the incident that resulted in the instant charges. Although the prosecutor argued during closing argument that Tameachi's admissions regarding her knowledge of defendant's prior convictions demonstrated that she had lied, her credibility was not a crucial part of this case and her testimony was only helpful to the defense in a relatively minor sense. Even accepting as true her testimony that she did not see defendant with a gun when he left the apartment that day with Carlos, that does not mean that defendant could not have still left the apartment with the gun hidden from Tameachi's view or obtained the gun at a later time before arriving at the vacant lot. Tameachi was not present in the vacant lot when Fultz and Shaw arrived and found the gun. The weight of Tameachi's testimony was therefore minimal in value, and the evidentiary error itself was relatively minor.

Further, the untainted evidence reflected that both Fultz and Shaw clearly observed defendant with the high-ammunition-capacity drum hanging out of his pants pocket and that they both saw defendant walk to the rear of the Monte Carlo, take the handgun with the drum attached out of his pocket, and place the gun into the trunk of the Monte Carlo. The handgun was recovered from the trunk by Fultz and Shaw almost immediately afterward. The untainted

---

however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

[4] The stipulation was read to the jury before Tameachi testified.

evidence also reflected that both Richardson and Carlos testified that they did not see defendant walk to the back of the Monte Carlo and that they had never before seen the gun that was recovered from the trunk. Carlos also appeared to testify that he had not seen defendant in possession of that gun.

However, the testimony of Richardson and Carlos was not necessarily or inherently contradictory to that of Fultz and Shaw. The testimony at trial also reflected that Richardson, Carlos, and defendant were involved in trying to jump-start the Monte Carlo as Fultz and Shaw arrived. Hence, defendant could have walked to the back of the car without being seen by Richardson and Carlos while their attention was occupied by their work on the car. Making this observation does not mean that we are making an improper credibility determination in favor of the police officers. Rather, it is a plausible explanation that reconciles the apparent conflict between the witnesses' respective observations in the vacant field that day.

We concede that it is not clear from the testimony what happened between defendant and Richardson with respect to the key, but resolving this apparent factual discrepancy is unnecessary under the circumstances of this case. The only element at issue for purposes of both the felon-in-possession and felony-firearm charges in this case was whether defendant carried or possessed the firearm. See MCL 750.224f (defining the crime of felon-in-possession, which makes it a felony for an individual with a prior felony conviction to, among other things, possess or carry a firearm unless certain requirements not at issue here are met); *Burgenmeyer*, 461 Mich at 438 ("To be guilty of felony-firearm, one must *carry* or *possess* the firearm, and must do so *when* committing or attempting to commit a felony."); see also MCL 750.227b(1) (defining the crime of felony-firearm). And regardless of how defendant was able to open the trunk, both Fultz and Shaw testified unequivocally, clearly, and without qualification that they saw defendant remove the handgun from his pocket and place it into the truck. Neither Fultz nor Shaw expressed any doubt about this crucial observation which, if believed to be true, established that defendant possessed the firearm. That Richardson and Carlos apparently did not see defendant walk to the trunk does not negate the testimony of Fultz and Shaw that they saw defendant remove a handgun from his pocket and place it into the trunk, and neither does Richardson's testimony that she did not give the car keys to defendant.

Moreover, even if these discrepancies between the testimony of the officers and the testimony of Richardson and Carlos are viewed as portraying conflicting versions of events forcing a choice between the two, it does not "affirmatively appear[]" to us that it is "more probable than not" that the brief, erroneously admitted references to defendant's prior convictions were the outcome determinative factor leading to defendant's conviction and, by implication, what would have been the apparent choice by the jury (again assuming that such a dualistic choice was what was required) to believe the officers' version over the version presented by Richardson and Carlos. *Lukity*, 460 Mich at 495-496. Our conclusion in this regard is guided by our Supreme Court's decision in *Denson*.

In that case, our Supreme Court held that the trial court's error under MRE 404(b) in admitting evidence regarding the defendant's prior assaultive conduct was not harmless where the defendant and the victim in the defendant's current case testified "to highly conflicting accounts" of the assault for which the defendant was currently on trial and the prosecutor asked

multiple witnesses questions about the details of the underlying facts of the prior assault committed by the defendant. *Denson*, 500 Mich at 389, 392-394, 406, 408-411, 413.

In *Denson*, both the victim and the defendant gave detailed accounts of the physical altercation that occurred between them, but those accounts were "starkly different." *Id*. at 390-391. According to the victim's testimony, the defendant burst into the defendant's daughter's room while the daughter and the victim were in a "compromising position," and the defendant then physically attacked the victim. *Id*. at 390. This attack consisted of punching, kicking, and hitting the victim with a lamp. *Id*. The victim also testified that the defendant forced both the victim and the daughter to undress and then took photographs of them, after which the defendant slashed the victim repeatedly with knives. *Id*. The victim "denied possessing a weapon during the attack, denied fighting back against defendant, and denied sexually assaulting or threatening [the daughter] in any way." *Id*. In contrast, the defendant testified in detail that he was in the basement watching a football game with his two sons when he "heard a loud noise and immediately ran upstairs to investigate." *Id*. at 391. He heard his daughter yell. *Id*. According to the defendant, he ran into his daughter's room and saw what he believed to be an ongoing sexual assault of his daughter. *Id*. The defendant testified that he struck the victim, chased the victim downstairs, and met the victim in the kitchen where both grabbed knives and the victim threw a glass at the defendant. *Id*. They both ran back upstairs and threw their knives at each other, at which time the victim left. *Id*. The defendant denied the victim's allegations regarding taking the photographs and the manner of knife use. *Id*.

At the defendant's trial, the prosecution elicited evidence "from several defense witnesses" of the underlying facts of the defendant's prior assault-with-intent-to-do-great-bodily-harm-less-than-murder conviction. *Id*. at 392-393. This included asking the defendant whether the specific facts of the unrelated prior incident—during which the defendant became upset with another individual over a drug debt, drove to that individual's home in Detroit, smashed the individual's car window, and shot the individual when he appeared on his porch—were true. *Id*.

The Supreme Court determined that the admission of this evidence was erroneous under MRE 404(b) and that this error was not harmless. *Id*. at 409-410. The *Denson* Court reasoned that "the introduction of the inadmissible evidence tipped the scales, buoying [the victim's] credibility while helping to sink defendant's." *Id*. at 410. In reaching its conclusion, the *Denson* Court further explained that "the prosecution used the other-acts evidence at trial to engineer an argument that the [prior] 2002 assault demonstrated that defendant was a violent person in general, which thereby proved that defendant assaulted Woodward without justification [during the incident for which the defendant was currently on trial] in 2012,"[5] and that the "prosecution also paraded this evidence in front of the jury in a manner that encouraged the jury to draw the

---

[5] During closing argument, the prosecutor "[a]dress[ed] defendant directly" and argued "that there was no reasonable doubt that defendant did not act in 'defense of anybody' because defendant was a 'bully' and a 'coward' who lost control with [the victim], just as he had lost control with [the victim of the defendant's prior 2002 assault]." *Denson*, 500 Mich at 412.

forbidden propensity inference, repetition which further enhanced the danger of unfair prejudice arising from admission of the other-acts evidence." *Id.* at 412.

The instant case, however, did not involve a situation where the erroneously admitted evidence was in the form of detailed underlying facts regarding defendant's prior convictions elicited from multiple witnesses and that was highly emphasized by such repetition. Instead, there was a brief reference to each of the two weapons-related prior convictions during the cross-examination of one witness. The prosecutor's argument with respect to the prior convictions evidence in the instant case was also merely focused on portraying a single witness—Tameachi—as unreliable and a liar. Moreover, it is worth repeating that there was not an inherent contradiction between the officers' testimony and that of Richardson and Carlos with respect to the most important detail at issue in this case, which was whether defendant actually possessed the gun and drum: both Fultz and Shaw testified that they saw defendant pull the gun out of his pocket and place it in the trunk of the Monte Carlo, while Richardson and Carlos only testified that they had not seen that gun before and that they did not see defendant walk to the trunk of the car where the pertinent act occurred. Hence, there is not the stark contrast between two highly detailed, yet disparate, accounts that was present in *Denson*.

In conclusion, our examination of the "entire cause" convinces us that it does not "affirmatively appear that it is more probable than not that the error was outcome determinative." *Lukity*, 460 Mich at 495-496 (quotation marks and citation omitted). The erroneously admitted evidence was not what "tipped the scales" under the specific facts and circumstances of this particular case. *Denson*, 500 Mich at 410, 413 n 15. Therefore, this evidentiary error is not a ground for reversal. *Lukity*, 460 Mich at 495-496.[6]

---

[6] Defendant argues in his supplemental brief that because the jury was deadlocked for a time and received a deadlocked jury instruction from the trial court, it was evident that the jury's decision was a difficult one that relied on all of the evidence admitted at trial and that the jurors' "tie-breaker" must have been the "forbidden" evidence of defendant's prior weapons-related convictions. The record reflects that the jury began its deliberations at 3:14 p.m. on the second day of trial with the instruction that the jury could deliberate until 4:00 p.m., after which it could come back the next day to resume deliberations if necessary. The jury returned for deliberations the next morning and at 10:10 a.m., the jury sent a note to the trial court stating, "We cannot come to a unanimous decision." The trial court, in placing the contents of this note on the record, informed the parties outside the jury's presence that it had "been clear from the beginning that there is a division amongst the jurors" based on the yelling and screaming that had been heard from the jury room. With the consent of both parties, the jury was brought into the courtroom and read the deadlocked jury instruction. See M Crim JI 3.12. Approximately 50 minutes later, the jury returned its verdict.

However, in making this argument, defendant ignores the fact that the untainted evidence, for the reasons discussed above, strongly supports the conclusion that defendant physically possessed the gun. As we have already explained, assessing the effect of this particular evidentiary error (which was relatively minor) in light of the weight and strength of the

Affirmed.

/s/ Stephen L. Borrello<br>
/s/ Jane E. Markey<br>
/s/ Michael J. Riordan

---

untainted evidence (which heavily supported the conclusion that defendant physically possessed the gun and drum), it does not *affirmatively appear* that it was "more probable than not that the error was outcome determinative." *Lukity*, 460 Mich at 495-496. The fact that the jury apparently struggled in reaching a unanimous verdict does not change our conclusion because it does not seem that this relatively minor error, especially considering that the jury was independently informed that defendant had previously been convicted of a felony, was more probably than not the piece of evidence that tipped the scales and helped the jury to overcome any difficulty it was having in reaching a verdict.

Moreover, the fact that the jury took its time and engaged in vigorous debate before deciding on a verdict does not necessarily support defendant's argument as clearly as he claims; had the jury returned a verdict quickly and without much time for discussion in a case as close as defendant argues this one was, defendant likely would have argued that the jury was only able to jump to such an instant conclusion by relying on a propensity inference from the improperly admitted prior-convictions evidence. Therefore, we conclude that the fact that the jury received a deadlocked jury instruction does not aid our harmless-error analysis under the circumstances of this case.

In light of the above discussion about the weight and strength of the untainted evidence, as well as the relatively minor nature of the error where evidence was erroneously admitted regarding defendant's prior weapons-related convictions but the jury had already been informed that defendant had previously been convicted of a felony, we do not conclude that this case is one where the jury more probably than not convicted defendant on the basis of his alleged "bad character"; instead we conclude that it was more likely that the jury convicted defendant on the basis of the untainted evidence that strongly supports the conclusion that defendant was guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Denson*, 500 Mich at 397-398.

-13-