*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KENNETH LEGRANT HAWKINS,

        Defendant-Appellant.

UNPUBLISHED
February 10, 2022

No. 352394
Oakland Circuit Court
LC No. 2019-271211-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LAKEISHA LEANETTE HAWKINS,

        Defendant-Appellant.

No. 352987
Oakland Circuit Court
LC No. 2019-271210-FH

---

Before: STEPHENS, P.J., and SAWYER and SERVITTO, JJ.

PER CURIAM.

Defendant Kenneth Hawkins and his daughter Lakeisha Hawkins were tried jointly, before separate juries. Kenneth was convicted of first-degree premeditated murder, MCL 750.316(1)(a), mutilation of a dead body, MCL 750.160, felon in possession of a firearm, MCL 750.224f, and two counts of possession of a firearm during the commission of a felony (felony-firearm), second offense, MCL 750.227b. Lakeisha was convicted of mutilation of a dead body, accessory after the fact to murder, MCL 750.505, felon in possession of a firearm, and felony-firearm. The trial court sentenced Kenneth as a fourth-offense habitual offender, MCL 769.12, to life imprisonment without parole for the murder conviction and 2 to 30 years each for the mutilation of a dead body and felon-in-possession convictions, which were to be served concurrently, but consecutively to concurrent prison terms of five years each for the felony-firearm convictions. The court sentenced Lakeisha as a third-offense habitual offender, MCL 769.11, to prison terms of 5 to 20 years for the

-1-

mutilation of a dead body conviction, 30 months to 10 years for the accessory-after-the-fact conviction, and 3 to 10 years for the felon-in-possession conviction, which were to be served concurrently, and a two-year term of imprisonment for the felony-firearm conviction, which was to be served consecutive to the felon-in-possession sentence. Both defendants appeal as of right. In Docket No. 352394, we reverse and remand for a new trial. In Docket No. 352987, we reverse Lakeisha's conviction of mutilation of a dead body, vacate the sentence, and remand for resentencing, absent that charge. On resentencing, if applicable, the trial court shall articulate its reasons for departing from the guideline range.

## I. FACTUAL BACKGROUND

Defendants' convictions arise from the shooting death of Lanard Curtaindoll at a social club in Pontiac and defendants' subsequent efforts to dispose of the body and conceal evidence of the crime.

The prosecution presented evidence that Lakeisha operated an unlicensed social club at 179 Edison Street in Pontiac, Michigan. Her father, Kenneth, provided security for the club and was known to carry a .45-caliber semiautomatic handgun. In the late evening of November 23 and into the early morning hours of November 24, 2018, both defendants, several patrons, and employees Michael Barbour and Hailey Sleeman were all present at the club. Curtaindoll arrived at the club looking for Lakeisha, with whom he had been romantically involved. Lakeisha was talking to another man when Curtaindoll grabbed her shirt and pulled her into the kitchen. Witnesses observed Curtaindoll and Lakeisha arguing before Curtaindoll grabbed Lakeisha by the neck, pushed her up against a wall or onto a table, and began choking her. Lakeisha's friend, Donna Moody, ran up to them and asked Curtaindoll what he was doing. Witnesses saw Kenneth then enter the kitchen, at which point, Curtaindoll stopped choking Lakeisha. Kenneth pointed his .45-handgun at Curtaindoll's chest, took a small step back, and then shot Curtaindoll in the chest. One witness heard Kenneth say, "Get your hands off my daughter" when he entered the kitchen, and another witness heard Kenneth say, "Player," just before he shot Curtaindoll. Curtaindoll, who was unarmed, died from his gunshot wound.

After it was apparent that Curtaindoll was dead, one of the defendants pulled his body into an area away from the kitchen, out of the view of other patrons. Kenneth removed some of Curtaindoll's clothing and all of his jewelry. Lakeisha directed employees Barbour and Sleeman to get rid of the car that Curtaindoll drove to the club and they left it at an apartment complex. Barbour admitted helping Kenneth move Curtaindoll's body into Lakeisha's car and then accompanying Kenneth while Lakeisha drove them to a vacant lot where they left the body. Thereafter, Lakeisha became worried that the body was not hidden, so she told Barbour to go back and hide the body. He returned to the area and placed branches and shrubbery over it. Kenneth also instructed Barbour get rid of the barrel to the handgun that Kenneth used, so Barbour dropped it down a sewer, where it was later recovered.

From November 2018 to April 2019, Curtaindoll's whereabouts were unknown and he was treated as a missing person. Lakeisha assisted in the efforts to locate him and even offered a reward for information about his whereabouts. In April 2019, a film crew discovered Curtaindoll's partially decomposed body while shooting scenes in the vacant lot. After the body was discovered, Sleeman went to the police on her own and told them what had happened. Barbour was arrested a

short time later and agreed to cooperate with police. Sleeman and Barbour were both offered immunity for their cooperation and served as the primary witnesses at trial.

Kenneth's defense theory at trial was that he was acting in defense of Lakeisha when he intervened in the altercation between Lakeisha and Curtaindoll, and that he grabbed a gun belonging to Barbour when he approached Curtaindoll because he knew that Curtaindoll was known to carry guns. The defense argued that Kenneth shot Curtaindoll in self-defense when Kenneth saw Curtaindoll reaching toward his waist. The defense conceded that Kenneth participated in moving Curtaindoll's body, but denied that Kenneth did anything to mutilate or deface the body.

Lakeisha's defense theory at trial was that she left the club after Curtaindoll was shot, she was not involved in the disposal of Curtaindoll's body or any coverup, and any testimony by Barbour and Sleeman to the contrary was not credible.

## II. DOCKET NO. 352394 (DEFENDANT KENNETH HAWKINS)

### A. OTHER-ACTS EVIDENCE

Kenneth argues that the trial court erred by admitting evidence of two other assaults by Kenneth, one against Sharon Turner in 1988 and another against Thorenia Glover in 2019. We agree.

In *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017), our Supreme Court stated:

A trial court's decision to admit evidence will not be disturbed absent an abuse of discretion. *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010). However, whether a rule or statute precludes admission of evidence is a preliminary question of law that this Court reviews de novo. *Id.* A trial court necessarily abuses its discretion when it admits evidence that is inadmissible as a matter of law. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999).

Prior to trial, the prosecution moved to admit evidence of other assaultive acts previously committed by Kenneth. The trial court granted the prosecutor's motion to introduce this evidence under MRE 404(b)(1). MRE 404(b)(1) prohibits evidence of a defendant's "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith," but permits such evidence for other noncharacter purposes. *People v Crawford*, 458 Mich 376, 384; 582 NW2d 785 (1998). "Underlying the rule is the fear that a jury will convict the defendant inferentially on the basis of his bad character rather than because he is guilty beyond a reasonable doubt of the crime charged." *Id.* Evidence of other crimes, wrongs, or acts is admissible under MRE 404(b)(1) if it is (1) offered for a proper purpose, i.e., not to prove the defendant's character or propensity to commit the crime, (2) relevant to an issue or fact of consequence at trial, and (3) sufficiently probative to outweigh the danger of unfair prejudice under MRE 403. *People v VanderVliet*, 444 Mich 52, 74-75; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994). To alleviate the risk of prejudice, a trial court, upon request, may provide the jury with a limiting instruction for any evidence admitted under MRE 404(b)(1). *Id.* at 75.

The prosecution has the initial burden of establishing the relevancy of the evidence for a permissible purpose under MRE 404(b)(1). *People v Knox,* 469 Mich 502, 509; 674 NW2d 366 (2004). "Relevance is a relationship between the evidence and a material fact at issue that must be demonstrated by reasonable inferences that make a material fact at issue more probable or less probable than it would be without the evidence." *Id.*, quoting *Crawford,* 458 Mich at 387; MRE 401. Under MRE 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *People v Sabin (After Remand)*, 463 Mich 43, 57-58; 614 NW2d 888 (2000).

At trial, the prosecution presented the testimony of two witnesses regarding other assaults committed by Kenneth, which the trial court admitted under MRE 404(b)(1). Sharon Turner testified that, in 1988, Kenneth became upset when she ended their relationship, and he appeared uninvited in her home. While in the presence of Turner's young son, Kenneth entered Turner's bedroom, made statements that he intended to kill her, and then shot her in the head. The bullet only grazed her head, but Turner pretended to be dead until Kenneth left. Thorenia Glover testified that, in 2019, she was at a social gathering with Kenneth and his girlfriend, Trudy, when Glover and Trudy became involved in a discussion in which Trudy accused Glover of being mean and rude to her. Although Glover claimed that she and Trudy were simply having a discussion, Kenneth jumped up, instructed Glover to be quiet, and called her names. After Kenneth threatened to beat Glover and she told him not to touch her, Kenneth repeatedly punched Glover in the face, causing her to fall to the floor, and then forcefully kicked her. Others intervened to remove Kenneth from the house.

The trial court instructed the jury on the following purposes for which it could consider Kenneth's other assaultive conduct:

> You have heard evidence that was introduced to show that the defendant committed crimes or improper acts for which he is not on trial. If you believe this evidence you must be very careful only to consider it for certain purposes. You may only think about whether this evidence tends to show that the defendant had a reason to commit the crime, that the defendant specifically meant to kill, that the defendant [knew] what the things found in his possession were, that the defendant acted purposefully, that is, not by accident or mistake or because he misjudged the situation, that the defendant used a plan, system or characteristic scheme that he has used before or since.
>
> You must not consider this evidence for any other purpose. For example, you must not decide that it shows that the defendant is a bad person or he is likely to commit crimes. You must not convict the defendant here because you think he is guilty of other bad conduct. All the evidence must convince you beyond a reasonable doubt that the defendant committed the alleged crime or you must find him not guilty.

Kenneth's primary argument on appeal is that any probative value of the evidence was substantially outweighed by the danger of unfair prejudice. The defense raised self-defense and

defense of others,[1] and the prosecution largely offered these other incidents to negate any claim of self-defense and to show that Kenneth acted with premeditation and deliberation. We find that distinguishing features associated with the other incidents negated their probative value in establishing a noncharacter purpose for the evidence.

It was undisputed in the instant case that Kenneth was responding to a situation of domestic violence between Curtaindoll and Lakeisha, who was Kenneth's daughter. The principal issue for the jury to resolve was whether Kenneth was acting in defense of Lakeisha or himself when he shot Curtaindoll. The jury was required to determine if Kenneth reasonably believed that Curtaindoll presented a risk of harm to Kenneth or his daughter at the time Kenneth shot him. In neither of the other incidents involving Glover and Turner was there any suggestion that Kenneth's assaults were provoked by any perceived threat of harm, or other circumstances that might cause a reasonable person to react aggressively. Given the factual differences between the other incidents and the charged offense, we do not believe that any of the stated purposes for admitting this evidence were supported by the other incidents. In other words, the prosecution did not establish that the other-acts evidence was logically relevant to any of the purposes for which the evidence was offered in this case.

The incident with Glover showed that Kenneth acted out violently during an argument. The facts of that incident are a little bit closer to those in the instant case because Kenneth was possibly intervening in an argument between his girlfriend and Glover. Unlike the instant case, however, there was no suggestion of any threat of harm to Kenneth or his girlfriend when Kenneth reacted violently. Conversely, it was undisputed in the instant case that Curtaindoll was assaulting Lakeisha when Kenneth initially approached him. The factual issues for the jury to resolve were whether the threat to Lakeisha had ended, or whether Kenneth had any reasonable apprehension of harm to himself, at the time Kenneth shot Curtaindoll. Kenneth's other assault of Glover was not probative of these issues. Kenneth's prior assault of Turner, in addition to having occurred more than 30 years earlier, involved his response to his former girlfriend's attempt to end their relationship. Evidence of that assault likewise was not probative of the issues that the jury in this case were required to resolve.

Although Kenneth's argument on appeal focuses on whether the probative value of the other-acts evidence was substantially outweighed by the danger of unfair prejudice under MRE 403, we conclude that the prosecution failed to show that the evidence was admissible for a proper purpose under MRE 404(b)(1) in the first instance. This case is factually similar to *Denson*, in which a defendant's prior attack of a victim in 2002 in order to recover a debt was offered as evidence to refute the defendant's claim of self-defense and defense of others in a case where the defendant allegedly spontaneously reacted violently upon discovering both the victim and the defendant's teenage daughter in a state of partial undress in 2012. The Court concluded that the 2002 incident "was not probative of anything other than defendant's allegedly bad character and propensity to commit the charged offense." *Denson*, 500 Mich at 406. The Court commented on the differences between the charged and uncharged offenses, stating:

---

[1] The trial court instructed the jury on self-defense and defense of others (Lakeisha).

-5-

The 2002 incident and the charged offense bore notable differences. See *Knox*, 469 Mich at 509-513; *Crawford*, 458 Mich at 395-397. The 2002 incident involved a completely different situation and a victim who was completely unrelated to the charged offense. The 2002 incident consisted of a seemingly calculated attack to recover a drug debt, whereas the instant offense involved an allegedly spontaneous reaction by defendant after he witnessed his daughter and Woodward in a state of partial undress. The 2002 incident did not involve a claim of self-defense or defense of others, while the current case clearly does. [*Denson*, 500 Mich at 406-407.]

The Court held that "[r]ather than . . . providing a proper noncharacter purpose for admission into evidence, the 2002 incident served solely to demonstrate defendant's propensity for violence." *Id.* at 407. The Court explained that "[t]he fact that defendant had previously assaulted a completely different individual in a completely different scenario years earlier had no probative force other than to show that defendant was the 'kind of person' who would assault someone." *Id.* The Court further commented that the other act "was remote in time, occurring approximately 10 years before the charged offense, which further limits its logical relevance." *Id.* n 11.

Plaintiff argues that Kenneth's other assaults were probative of his intent, and therefore, were relevant to the issue of premeditation, but as in *Denson*, the other-acts evidence showed that Kenneth had previously assaulted completely different individuals in entirely different scenarios, none involving any claim of self-defense or defense of others, which clearly was at issue in this case. It was impermissible for the prosecution to rely on the other assaults to show Kenneth's propensity for violence or to show that he was the kind of person who would assault someone. As explained in *Denson*, "the other-acts evidence created a chain of inferences dependent on the preliminary conclusion that defendant had violent tendencies and acted consistently with those tendencies in attacking [the victim]. This is exactly the kind of propensity evidence that MRE 404(b) prohibits." *Id.* at 407-408 (citation omitted). Moreover, the incident involving Turner was exceedingly remote, having occurred more than 30 years earlier, which further undermines its logical relevance. *Id.* at 407 n 11. Accordingly, the trial court erred by admitting the other-acts evidence under MRE 404(b)(1).

"A preserved nonconstitutional error 'is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative—i.e., that it undermined the reliability of the verdict.' " *Denson*, 500 Mich at 409 (citation omitted); *Lukity*, 460 Mich at 495-496. A reviewing court must "focus[] on the nature of the error and assess[] its effect in light of the weight and strength of the untainted evidence." *Denson*, 500 Mich at 409-410. In this case, the erroneous admission of the other-acts evidence was not harmless.

The principal issues at trial were Kenneth's state of mind when he shot Curtaindoll, including whether he acted in self-defense or defense of Lakeisha. While there was evidence that Kenneth said "Player" just before he shot Curtaindoll, and thus may have shot Curtaindoll intentionally, when Curtaindoll was no longer a threat of harm to Lakeisha or Kenneth, another witness heard Kenneth say, "Get your hands off my daughter," just before shooting him. Moody also described Curtaindoll, who was known to carry firearms, as reaching into his waistband just before Kenneth shot him. Given the above, it is reasonably probable that the other-acts evidence influenced the jury to find that Kenneth was a violent individual who shot Curtaindoll for that

-6-

reason. Accordingly, the erroneous admission of the other-acts evidence was not harmless. Kenneth is thus entitled to a new trial.

While the grant of a new trial renders Kenneth's other arguments on appeal moot, we nevertheless address two issues in order to guide the new trial.

## B. REPUTATION EVIDENCE

Kenneth argues that the trial court erred by excluding evidence of Curtaindoll's reputation in the community. We agree.

A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion.[2] *People v Edwards*, 328 Mich App 29, 34; 935 NW2d 419 (2019). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id.* However, a trial court's interpretation of the Michigan Rules of Evidence involves an issue of law, which is reviewed de novo. *Id.*

At trial, defense witness Donna Moody testified that she had previously seen Curtaindoll threaten people with a gun. In particular, she testified that she personally saw Curtaindoll pull guns on Moody's brother, on Lakeisha, and on other patrons at the social club. She also testified, without objection, that she had heard about Curtaindoll pulling a gun on his own brother. Thereafter, defense counsel asked Moody if she was aware of Curtaindoll's reputation in the community. The prosecutor objected on the basis of relevancy, arguing that Moody's opinion was not relevant because she was not on trial, and the trial court sustained the objection.

Kenneth argues that the trial court erred by not allowing Moody to testify about her knowledge of Curtaindoll's reputation in the community for violence. We agree. This Court recently addressed the admissibility of a homicide victim's reputation or character in *Edwards*, 328 Mich App at 34-37, stating:

> The admissibility of character evidence is governed by MRE 404 and MRE 405. MRE 404 provides in relevant part:
>
> > (a) *Character evidence generally*. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
> >
> > > (1) *Character of accused*. Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the

---

[2] We disagree with plaintiff that defense counsel waived any error by remarking, "Well, that's fine," after the prosecutor objected. We do not view that remark as an expression of defense counsel's agreement that the subject testimony was not admissible. Indeed, the trial court apparently had this same view because it proceeded to rule on the prosecutor's objection, which it sustained.

same; or if evidence of a trait of character of the alleged victim of the crime is offered by the accused and admitted under subdivision (a)(2) . . . ;

   (2) *Character of alleged victim of homicide*. When self-defense is an issue in a charge of homicide, evidence of a trait of character for aggression of the alleged victim of the crime offered by an accused . . . .

MRE 405 provides the methods of proving character:

   (a) *Reputation or opinion*. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into reports of relevant specific instances of conduct.

   (b) *Specific instances of conduct*. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct.

In *People v Harris*, 458 Mich 310, 314-317; 583 NW2d 680 (1998), a homicide case, the Michigan Supreme Court held that evidence of the violent character of the decedent in the form of reputation evidence is admissible, even if unknown to the defendant, to show the decedent's probable aggression and act of violence at the time the decedent was killed. Our Supreme Court explained, however, that reputation evidence could not be used to prove the defendant's state of mind unless the defendant knew about the decedent's character at the time:

> [W]here a defendant charged with murder asserts that he killed in self-defense, his state of mind at the time of the act is material because it is an important element in determining his justification for his belief in an impending attack by the deceased. The reputation of the deceased for a violent or turbulent disposition is a circumstance that would cause such a belief. However, unlike evidence tending to show that the victim was the aggressor, the deceased's violent reputation must be known to the defendant if he is to use it to show that he acted in self-defense. Reputation in the neighborhood where both live is sufficient with nothing more. The strength of the deceased as well as his habitual carrying of weapons or his possession of them at the time of the affray, if known to the defendant, should be considered as properly affecting his apprehensions. The purpose of this evidence is to show the defendant's state of mind; therefore, it is obvious that the victim's character, as affecting the defendant's apprehensions, must have

become known to him, otherwise it is irrelevant. [*Id*. at 316-317 (quotation marks and citations omitted).]

Our Supreme Court also distinguished character evidence used in relation to an ultimate issue in a case from character evidence used as circumstantial evidence of an act. *Id*. at 317. The Supreme Court explained that in cases "[w]here character is 'in issue,' the character of a person may be an element of the . . . defense." *Id*. at 318. In such cases, "[MRE] 405 allows specific instances of violence to be admitted. . . ." *Id*. at 319. The *Harris* Court cited this Court's decision in *People v Cooper*, 73 Mich App 660; 252 NW2d 564 (1977), for the well-settled law that specific acts of aggression by the decedent are admissible to establish a defendant's reasonable apprehension of harm.

In cases where the decedent's character was not an essential element and "in issue," our Supreme Court clarified that the general rule applied, and the decedent's character "may not be shown by specific instances of conduct. . . ." *Harris*, 458 Mich at 319. Our Supreme Court explained:

As a general rule, the character of the victim may not be shown by specific instances of conduct unless those instances are independently admissible to show some matter apart from character as circumstantial evidence of the conduct of the victim on a particular occasion.

"[W]hen character is not an essential element, it may be shown only by reputation or opinion evidence. . . . Hence, construed literally, Rule 405 does not permit a defendant to use specific instances to show that the victim was the aggressor since the aggressive character of the victim is not an essential element of the defense of self-defense since the aggressive character of the victim is introduced as circumstantial evidence to show that the victim committed the first or primary *act* of aggression against the defendant, which is to say that the defense of self-defense in this situation makes an act of the victim, rather than a trait of the victim's character, the material issue." [*Id*. (citation omitted; alteration in original).]

Therefore, the rule enunciated in *Harris* is twofold. First, evidence of a victim's aggressive character is admissible in the form of reputation evidence, even if the defendant does not have knowledge of the decedent's character, to show that the decedent was the probable aggressor. With that said, evidence of the decedent's reputation that is not known to the defendant is inadmissible to prove an essential element of self-defense, e.g., a reasonable apprehension of harm. Second, evidence

of the decedent's specific acts of violence is admissible only to prove an essential element of self-defense, such as a reasonable apprehension of harm.

The foregoing rationale leads us to conclude that the trial court erred by sustaining the prosecutor's objection to Moody proposed testimony about Curtaindoll's reputation in the community on the basis that it was Moody, not Kenneth, who was offering the opinion. Plaintiff appears to concede error on this point. Although Moody's opinion of Curtaindoll's reputation for violence would not be admissible to show Kenneth's reasonable apprehension of harm, it was admissible for its relevancy to show that Curtaindoll was the aggressor.

## C. MUTILATION OF A DEAD BODY

Although not raised by Kenneth on appeal, for the reasons stated below, we find that the evidence did not support Kenneth's conviction of mutilation or defacement of a dead body.

## III. DOCKET NO. 352987 (DEFENDANT LAKEISHA HAWKINS)

### A. INSUFFICIENT EVIDENCE

Lakeisha argues that the evidence did not support her conviction under MCL 750.160 for mutilation or defacement of a dead body. We agree.

This Court reviews a challenge to the sufficiency of the evidence de novo. *People v Hammons,* 210 Mich App 554, 556; 534 NW2d 183 (1995). This Court must view the evidence in a light most favorable to the prosecution to determine whether there was sufficient evidence to justify a rational trier of fact in finding the defendant guilty beyond a reasonable doubt. *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). Circumstantial evidence and any reasonable inferences that can be drawn from the evidence may be sufficient to prove the elements of a crime. *People v Abraham,* 234 Mich App 640, 656; 599 NW2d 736 (1999). "This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Williams,* 268 Mich App 416, 419; 707 NW2d 624 (2005). Any conflicts in the evidence must be resolved in favor of the prosecution. *People v Jackson,* 292 Mich App 583, 587-588; 808 NW2d 541 (2011). To the extent that this issue involves the interpretation of a statute, issues of statutory interpretation involve questions of law, which are reviewed de novo. *People v Kennedy*, 502 Mich 206, 213; 917 NW2d 355 (2018).

The prosecutor's theory at trial was that Lakeisha aided or abetted the mutilation or defacement of Curtaindoll's dead body. To convict a defendant under an aiding or abetting theory, the prosecution must prove that (1) the crime charged was committed by the defendant or another person, (2) the defendant performed acts or gave encouragement that assisted in the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement. *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999); see also *People v Robinson,* 475 Mich 1, 6; 715 NW2d 44 (2006). Evidence was presented at trial that Kenneth and Barbour removed Curtaindoll's dead body from the club, placed it in Lakeisha's car, and then Lakeisha drove the two of them to a vacant field where they left the body. Thereafter, Lakeisha became concerned that the body would be discovered, so she instructed Barbour to go back and hide the body,

-10-

whereupon he went back and placed branches and shrubbery over it. This evidence was sufficient to show that Lakeisha aided or abetted Kenneth's and Barbour's efforts to remove Curtaindoll's dead body from the club, bring it to a vacant field and leave it there, and then hide the body to prevent its discovery. Indeed, Lakeisha does not argue on appeal that the evidence was insufficient to show that she assisted in these efforts to remove and hide Curtaindoll's body. Instead, she argues that the evidence failed to show that these actions involved the mutilation or defacement of Curtaindoll's dead body.

This Court addressed the elements of this offense in *People v Bass*, 317 Mich App 241, 269-271; 893 NW2d 140 (2016), stating:

> No published authority has yet set forth the essential elements of mutilation of a human body under MCL 750.160. We take this opportunity to do so. The statute provides, in pertinent part:
>
> > A person, not being lawfully authorized so to do . . . who shall mutilate, deface, remove, or carry away a portion of the dead body of a person, whether in his charge for burial or otherwise, whenever the mutilation, defacement, removal, or carrying away is not necessary in any proper operation in embalming the body or for the purpose of a postmortem examination, and every person accessory thereto, either before or after the fact, shall be guilty of a felony, punishable by imprisonment for not more than 10 years, or by fine of not more than $5,000.00. This section shall not be construed to prohibit the digging up, disinterment, removal or carrying away for scientific purposes of the remains of prehistoric persons by representatives of established scientific institutions or societies, having the consent in writing of the owner of the land from which the remains may be disinterred, removed or carried away. [MCL 750.160.]
>
> Using a plain language analysis involving dictionary definitions, an unpublished opinion of this Court recently interpreted the statute as follows:
>
> > *Black's Law Dictionary* (8th ed) defines "mutilation" as the "act of cutting off or permanently damaging a body part." To "mutilate" is otherwise defined as "to injure or disfigure by removing or irreparably damaging parts." *Random House Webster's College Dictionary* (2001). To "deface" means "to mar the surface or appearance of; disfigure." *Random House Webster's College Dictionary* (2001). To "remove" means "to move or shift from a place or position." *Random House Webster's College Dictionary* (2001). Thus, according to the plain language[2] of the statute, a person may not cause irreparable or permanent damage or injury to, change the appearance of, or remove a portion of, the dead body.

-11-

[2]Because the plain language of the statute is clear and unambiguous, we decline to adopt defendant's more restrictive definition of mutilation for which he finds support in this Court's cases related to the common-law tort for mutilation of a dead body. See *Dampier v Wayne Co*, 233 Mich App 714, 729; 592 NW2d 809 (1999) (defining mutilation as the "active incision, evisceration, or dismemberment of a dead body"). We are not persuaded that this tort definition has become a technical, common-law definition, which should affect our analysis of the criminal statute. We note that other defendants have been criminally convicted of this crime where they burned a dead body. *People v Williams*, 265 Mich App 68, 70; 692 NW2d 722 (2005). Burning does not involve cutting, eviscerating, or dismembering a body.

[*People v Peña*, unpublished opinion of the Court of Appeals, issued March 13, 2008 (Docket No. 275508), p 3.]

We agree with this persuasive analysis. Accordingly, we hold that a defendant is guilty of mutilation of a human body under MCL 750.160 if the defendant (1) without any legal authorization to do so, (2) causes permanent damage to a portion of a dead body, defaces a portion of a dead body by marring its appearance, or removes or carries away from the whole a portion of a dead body.

Hence, it is clear that there was sufficient evidence for a rational fact-finder to find defendant guilty of mutilation of a human body. As we have explained, it is reasonable to infer from the record evidence that defendant shot and killed the victim. In turn, it is reasonable to infer that defendant is the person who attempted to conceal the murder by burning the victim's body with gasoline. The body was almost totally charred, and portions of it were entirely consumed by the fire. The damage was so serious that it could not be visually determined by Dr. Sung whether the body belonged to a male or a female. And it is reasonable to infer from the record evidence that defendant lacked any legal authority to burn the victim's body. Therefore, there was sufficient evidence that defendant irreparably damaged a portion of the body and defaced it, and his conviction of mutilation of a dead body should be affirmed. [Footnote omitted.]

This Court went on to explain that

[t]he word "portion" generally denotes a "limited part of a whole," *Merriam-Webster's Collegiate Dictionary* (11th ed), and we construe it by that plain meaning here. The fire irreparably damaged only a portion of the victim's body, not the whole, as evidenced by witness reports of visible toenail polish on one of the victim's toenails and the fact that intact bone fragments were used for DNA testing. Therefore, we need not—and do not—consider whether the term "portion" in MCL

750.160 also encompasses damage or defacement of a *whole* human body. [*Bass*, 317 Mich App at 271-272 n 10.]

To the extent that the prosecutor interprets MCL 750.160 as making it a crime to simply move or carry away an entire dead body, we disagree with that interpretation. Rather, under the plain language of MCL 750.160, it is a crime to mutilate or deface a dead human body without authority to perform any embalming or autopsy procedures. Alternatively, as explained in *Bass*, the statute is also violated when one removes or carries away a portion of a dead human body. We believe that the statute's use of the term "portion of a dead body" simply conveys that there must be some form of dismemberment of a body part, or a separation and carrying away of part of a body from the remainder of the body, both of which are consistent with the plain meaning of mutilation or defacement.

In this case, the evidence indicated that Curtaindoll's entire body was moved and carried away; there was no evidence of any movement or carrying away of only a portion of the dead body. Thus, the material question is whether the evidence otherwise supported a finding that Lakeisha aided or abetted in the mutilation or defacement of Curtaindoll's body. We find that it does not.

The *Bass* Court relied heavily upon *People v Peña*, an unpublished decision of this Court, in deciding whether the *Bass* defendant was properly convicted of violating MCL 750.160 when he burned the deceased body of his murder victim. In *Pena*, this Court declined to adopt the defendant's proposed restrictive definition of mutilation, that being the active incision, evisceration, or dismemberment of a dead body. We find no error in this decision or in the *Bass* Court's reliance on that portion of the *Peña* decision. However, the instant case differs from both *Peña* and *Bass* in one significant way: here, no one undertook to damage the dead body.

*Peña* addressed a situation where the defendant damaged a dead body with his fist. *Id*. at 3; *Bass*, 317 Mich App at 270-271. The *Bass* defendant similarly actively damaged a dead body by burning it and, as the *Bass* Court pointed out, previous panels of this Court had convicted of violating MCL 750.160 when they had burned a dead body. *Id*. at 270. The *Bass* Court thus held that a defendant is guilty of mutilation of human body under MCL 750.160 if he or she "causes permanent damage to a portion of a dead body, defaces a portion of a dead body by marring its appearance, or removes or carries away from the whole a portion of a dead body." *Id*. at 271. That the above definition uses "active" words to describe the prohibited behaviors is significant, in that it indicates that a defendant must take an action on or towards a dead body to cause permanent damage, deface, or mar the appearance of the dead body.[3]

In this case, neither Lakeisha, nor Kenneth or Barbour, undertook an action to "cause permanent damage to a portion of a dead body," or "deface[] a portion of a dead body by marring its appearance." Instead, she assisted Kenneth and Barbour in removing Curtaindoll's dead body

---

[3] The prosecutor focuses on the *Bass* Court's use of the word "causes" to argue that Lakeisha's actions in helping place the body in a field was the direct and a proximate cause of the defacement of the body. "Causes," however, does not appear in MCL 750.160. Moreover, we decline to read "causes" as expansively as the prosecutor suggests, given the context in which it is used in *Bass*.

from the club and taking it to a vacant field.  There is no indication that anyone present actively inflicted any damage on the dead body.  Instead, the parties left the body in the field.  It is true that the body was not likely to be quickly discovered, was left it in a location where it was exposed to the elements and wildlife and, when found five months later, portions were missing or had been destroyed.  However, a dead body left unattended in most locations (including indoors) would not conceivably be in the same condition five months later, whether due to decomposition or rodent/animal interference or otherwise.

Moreover, MCL 750.160 criminalizes the mutilation and/or defacement of a dead body "whenever the mutilation, defacement . . . is not necessary in any proper operation in embalming the body or for the purpose of a postmortem examination."  We surmise that most murder victims' bodies are either left where they are or moved in attempt to hide the murder and that murderers' leaving of a dead body is never necessary for proper embalming or postmortem examination.  Were we to interpret MCL 750.160 as applicable in any instance a body is simply left where it lies or is transported to a place of hiding then every defendant guilty of murder would automatically also be guilty of the mutilation or defacement of a dead body.  Had our Legislature intended such result, it could have used language specifically indicating this intent.  Because it did not do so, we are left with the specific words of "mutilation" and "defacement" employed in MCL 750.160 and the definitions set forth in *Bass* concerning those terms.[4]

As pointed out in *Bass*, quoting *Peña:*

*Black's Law Dictionary* (8th ed.) defines "mutilation" as the "act of cutting off or permanently damaging a body part." To "mutilate" is otherwise defined as "to injure or disfigure by removing or irreparably damaging parts." *Random House Webster's College Dictionary* (2001). To "deface" means "to mar the surface or appearance of; disfigure." *Random House Webster's College Dictionary* (2001). [*Bass*, 317 Mich App at 270]

There was no evidence that Lakeisha (or anyone else) cut off or permanently damaged a body part, injured or disfigured the body by removing or irreparably damaging parts, or marred the surface of or disfigured the body.  Accordingly, the evidence was insufficient to support Lakeisha's conviction of aiding and abetting the mutilation or defacement of a dead body.

As previously stated, although this issue was not raised by Kenneth on appeal, for the reasons stated above, we find that there was insufficient evidence to support Kenneth's conviction of mutilation or defacement of a dead body as well.

## B. ACCOMPLICE INSTRUCTION

---

[4] A court "must not judicially legislate by adding into a statute provisions that the Legislature did not include." *Pike v N Michigan Univ*, 327 Mich App 683, 697; 935 NW2d 86 (2019) (citation omitted).

Next, Lakeisha argues that the trial court erred by failing to give M Crim JI 5.4 and 5.6 when instructing the jury. These instructions would have advised the jury that Barbour and Sleeman were accomplices and, as such, the jury should consider their testimony with caution. Because Lakeisha did not request these instructions at trial, this claim of instructional error is unpreserved and review is limited to plain error affecting substantial rights.[5] *Carines*, 460 Mich at 763-764. Lakeisha further argues, however, that defense counsel was ineffective for failing to request the accomplice instructions. Our review of the ineffective-assistance claim is limited to errors apparent from the record. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).

M Crim JI 5.4, "Witness as Undisputed Accomplice," provides:

(1) [*Name witness*] says [he / she] took part in the crime that the defendant is charged with committing.

[Choose as many of the following as apply:]

[(a) (*Name witness*) has already been convicted of charges arising out of the commission of that crime.]

[(b) The evidence clearly shows that (*name witness*) is guilty of the same crime the defendant is charged with.]

[(c) (*Name witness*) has been promised that (he / she) will not be prosecuted for the crime the defendant is charged with committing based upon any information derived directly or indirectly from the witness's truthful testimony. The witness may be prosecuted if the prosecution obtains additional, independent evidence against the witness.]

[(d) (*Name witness*) has been promised that (he / she) will not be prosecuted for the crime the defendant is charged with committing.]

(2) Such a witness is called an accomplice.

M Crim JI 5.6, "Cautionary Instruction Regarding Accomplice Testimony," provide:

---

[5] We disagree with plaintiff's argument that review of this issue is waived because defense counsel expressed satisfaction with the jury instructions *as given*. A waiver occurs when there is an "intentional relinquishment or abandonment of a known right." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). An affirmative approval of a court's jury instructions may constitute a waiver, but a failure to object does not. *Id.* at 215-216. The alleged error here involves the omission of an instruction that was never requested. By affirmatively expressing satisfaction with the jury instructions as given, defense counsel was not expressing any opinion regarding any omitted instruction. Accordingly, this issue was not waived, but because it is unpreserved, it is still subject to review for plain error affecting substantial rights.

(1)  You should examine an accomplice's testimony closely and be very careful about accepting it.

(2)  You may think about whether the accomplice's testimony is supported by other evidence, because then it may be more reliable.  However, there is nothing wrong with the prosecutor's using an accomplice as a witness.  You may convict the defendant based only on an accomplice's testimony if you believe the testimony and it proves the defendant's guilt beyond a reasonable doubt.

(3)  When you decide whether you believe an accomplice, consider the following:

(a) Was the accomplice's testimony falsely slanted to make the defendant seem guilty because of the accomplice's own interests, biases, or for some other reason?

(b) Has the accomplice been offered a reward or been promised anything that might lead [him / her] to give false testimony?  [*State what the evidence has shown.  Enumerate or define reward*.]

(c) Has the accomplice been promised that [he / she] will not be prosecuted, or promised a lighter sentence or allowed to plead guilty to a less serious charge?  If so, could this have influenced [his / her] testimony?

[(d) Does the accomplice have a criminal record?]

(4)  In general, you should consider an accomplice's testimony more cautiously than you would that of an ordinary witness.  You should be sure you have examined it closely before you base a conviction on it.

In this case, Barbour and Sleeman both admitted being present when Curtaindoll was shot. They also both admitted participating in the coverup efforts after the crime, and to being offered immunity in exchange for their testimony.  Accordingly, the trial court instructed Lakeisha's jury consistent with M Crim JI 5.13, which advises the jury that it may consider a witness's immunity agreement with the prosecution as it relates to the witness's credibility, and whether such an agreement tends to show the witness's bias or self-interest in testifying.  In *People v Lockett*, 295 Mich App 165, 185-186; 814 NW2d 295 (2012), this Court held that where an accomplice witness was subject to an immunity agreement, the trial court did not abuse its discretion by refusing to give both M Crim JI 5.13 and M Crim JI 5.6, because to do so would be confusing.  This Court stated:

The trial court refused to give both the immunity instruction contained in CJI2d 5.13 and the accomplice instruction contained in CJI2d 5.6 because it determined that providing both instructions would be "very confusing to the jury," and instead it let defendants choose which of the two instructions was to be given. We conclude that the trial court did not abuse its discretion in denying the request to have both instructions presented because the instructions as given fairly presented the issues to the jury and sufficiently protected defendants' rights.  The

-16-

primary purpose of both instructions is to raise the jury's awareness of the potential ulterior motives of the witness. Both the accomplice and immunity instructions caution the jury that the witness may have some reason not to testify truthfully. The immunity instruction's cautions about S.'s credibility were extensive enough to sufficiently protect defendants' rights. Defendants have also failed to establish that a difference in jury instructions would have affected the outcome of the case, given that S.'s testimony that she had sexual intercourse with each defendant in the back of the van was supported by other testimony, including the testimony of J. and Officer Garrison.

In this case, the trial court instructed the jury, consistent with M Crim JI 5.13, as follows:

> You have heard testimony that a witness, Mr. Michael Barbour and Ms. Hailey Sleeman, made an agreement with the prosecutor about charges against him or her in exchange for his or her testimony in this trial. You have also heard evidence that Mr. Barbour faced a possible penalty of 10 years and Ms. Sleeman faced a possible penalty of 5 years as a result of those charges. You are to consider this evidence only as it relates to Mr. Barbour's and Ms. Sleeman's credibility as— as it may tend to show Mr. Barbour's and Ms. Sleeman's bias or self-interest.

Because the trial court gave M Crim JI 5.13, its failure to also give M Crim JI 5.4 and 5.6 does not qualify as plain error.

Furthermore, unlike in *Lockett*, there was no request in this case for an accomplice instruction and, absent a request, failure to give a cautionary instruction on accomplice testimony does not require reversal when potential problems with an accomplice's credibility have been plainly presented to the jury. *People v Reed*, 453 Mich 685, 692-693; 556 NW2d 858 (1996). In this case, the potential problems with Barbour's and Sleeman's credibility were fully explored at trial. Indeed, this was a central theme of Lakeisha's defense. Moreover, by giving M Crim JI 5.13, the trial court adequately informed the jury that it should consider Barbour's and Sleeman's agreements with the prosecution when evaluating their credibility because of their possible bias and self-interest in testifying. Accordingly, failure to give M Crim 5.4 and 5.6 did not affect Lakeisha's substantial rights.

We also reject Lakeisha's argument that her trial attorney was ineffective for not requesting the accomplice instructions. For the reasons already discussed, defense counsel reasonably may have determined that the accomplice instructions were not necessary in light of the trial court's decision to give M Crim JI 5.13. Furthermore, because the potential problems with Barbour's and Sleeman's credibility were fully explored at trial and M Crim JI 5.13 adequately informed the jury that Barbour's and Sleeman's agreements with the prosecution should be considered in evaluating their credibility, there is no reasonable probability that the outcome of trial would have been different if counsel had requested M Crim JI 5.4 and 5.6.

## C. ADDICT-INFORMER INSTRUCTION

Lakeisha further argues that the trial court erred by denying her request for the addict-informer jury instruction, M Crim JI 5.7, which advises the jury to consider the uncorroborated testimony of an addict-informer with caution. We disagree.

We review the trial court's refusal to give M Crim JI 5.7 for an abuse of discretion. *People v Mitchell*, 301 Mich App 282, 286; 835 NW2d 615 (2013). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Edwards*, 328 Mich App at 34.

Crim JI 5.7 provides:

(1) You have heard the testimony of _____, who has given information to the police in this case. The evidence shows that [he / she] is addicted to a drug, namely _____.

(2) You should examine the testimony of an addicted informer closely and be very careful about accepting it.

(3) You should think about whether the testimony is supported by other evidence, because then it may be more reliable. However, there is nothing wrong with the prosecutor using an addicted informer as a witness. You may convict the defendant based on such a witness's testimony alone if you believe the testimony and it proves the defendant's guilt beyond a reasonable doubt.

(4) When you decide whether to believe [*name witness*], consider the following:

(a) Did the fact that this witness is addicted to drugs affect [his / her] memory of events or ability to testify accurately?

(b) Does the witness's addiction give [him / her] some special reason to testify falsely?

[(c) Does the witness expect a reward or some special treatment or has (he / she) been offered a reward or been promised anything that might lead (him / her) to give false testimony?

(d) Has the witness been promised that (he / she) will not be prosecuted for any charge, or promised a lighter sentence or allowed to plead guilty to a less serious charge? If so, could this have influenced (his / her) testimony?

(e) Was the witness's testimony falsely slanted to make the defendant seem guilty because of the witness's own interests or to remove suspicion from others, or because (he / she) feared retaliation from others in drug trafficking?

(f) Was the witness affected by the fear of being jailed and denied access to drugs?

(g) Does the witness have a past criminal record?]

(5) In general, you should consider an addicted informer's testimony more cautiously than you would that of an ordinary witness. You should be sure you have examined it closely before you base a conviction on it.

The trial court did not abuse its discretion by ruling that this instruction was inappropriate and not necessary in this case.

First, the instruction provides guidance for evaluating the testimony of an addict-informant largely in light of a present addiction. In this case, there was no evidence that Barbour or Sleeman were addicts or using drugs at the time of trial. Second, the addict-informer instruction should be given "where the testimony of the informant is the only evidence linking the defendant to the offense." *People v Griffin*, 235 Mich App 27, 40; 597 NW2d 176 (1999), overruled in part on other grounds by *People v Thompson*, 477 Mich 146, 148 (2007). Lakeisha only asked for this instruction with respect to Barbour's testimony, which Sleeman corroborated. In addition, material aspects of Barbour's and Sleeman's testimony was corroborated by the police investigation, which revealed evidence consistent with Barbour's and Sleeman's accounts. Third, the use notes for M Crim JI 5.7 recognize that there may be other instructions that may be applicable and, as noted earlier, the trial court gave special instructions advising the jury to consider the impact of Barbour's and Sleeman's immunity agreements when evaluating their credibility. While there was also an effort to show that Barbour's and Sleeman's drug use may have affected their memories or ability to testify accurately, the trial court's general instructions advised the jury that in determining whether a witness was credible, it should consider factors such as whether "the witness [was] able to see and hear clearly" or whether "anything else [was] going on that might have distracted the witness." In sum, because M Crim JI 5.7 did not precisely fit the facts of this case and because the trial court's remaining instructions adequately advised the jury on how to consider Barbour's and Sleeman's credibility, the trial court did not abuse its discretion by refusing to give M Crim JI 5.7.

## D. SENTENCING

Lakeisha argues that the trial court erred by departing from the applicable sentencing guidelines ranges without acknowledging that it was doing so, and without providing reasons to justify the departure sentences. We agree.

The trial court scored the sentencing guidelines for both the mutilation of a dead body and the felon-in-possession convictions. The guidelines ranges were 19 to 57 months and 10 to 34 months, respectively, for these convictions. The trial court sentenced Lakeisha to prison terms of 5 to 20 years for the mutilation of a dead body conviction and 3 to 10 years for the felon-in-possession conviction, both of which represented departures from the applicable guidelines ranges. As previously indicated, because there was insufficient evidence to convict Lakeisha of mutilation of a dead body, her conviction and sentence for that offense are vacated.

Concerning the felon-in-possession conviction, as plaintiff concedes, the trial court did not provide any reasons for departing from the guidelines ranges and, indeed, it did not even acknowledge that it was doing so. The trial court abused its discretion by imposing departure

sentences without sufficient articulation of its reasoning. *People v Dixon-Bey*, 321 Mich App 490, 525; 909 NW2d 458 (2017).

In Docket No. 352394, we reverse and remand for a new trial. In Docket No. 352987, we reverse Lakeisha's conviction of mutilation of a dead body, vacate the sentence for that offense, and remand for resentencing absent that conviction. On resentencing, if applicable, the trial court shall articulate its reasons for departing from the applicable guideline range. We do not retain jurisdiction.

/s/ Cynthia Diane Stephens
/s/ David H. Sawyer
/s/ Deborah A. Servitto